In re PRUDENCE BONDS CORPORATION
(two cases).

No. 26545.

District Court, E. D. New York.

March 9, 1944.

George C. Wildermuth, of Brooklyn, N. Y. (Charles H. Kelby, of New York City, of counsel), for objectors Charles H. Kelby and Clifford S. Kelsey.

Maclay, Lyeth & Williams, of New York City, for Bank of Manhattan Co.

Charles M. McCarty, of New York City, for Prudence Bonds Corporation.

Irving L. Schanzer, of New York City, for Prudence Realization Corporation.

Samuel Silbiger, of Brooklyn, N. Y., for George E. Eddy.

Joseph Nemerov and Henry Schwartz, both of New York City, for Bondholders.

INCH, District Judge.

As far back as June, 1939, the right of bondholders in a reorganization to compel a restoration of the res to a trust fund was established as differentiated from suits against the trustee of that fund for damages and similar actions. Central Hanover Bank & Trust Co. v. President and Directors of Manhattan Co., 2 Cir., 105 F.2d 130. This has been followed on other appeals. Manufacturers Trust Co. v. Kelby, 2 Cir., 125 F.2d 650; and Brooklyn Trust Company v. Kelby, 2 Cir., 134 F.2d 105, certiorari denied 319 U. S. 767, 63 S.Ct. 1330, 87 L.Ed. 1717. The difference between the establishment by individuals of an interest in trust funds and the efforts of the trustees of the debtor to obtain a restoration of the corpus of a trust fund has been thus fully sustained.

The final steps now being taken in this reorganization of the Prudence Bonds Corporation, that is, the accounting of the various corporate trustees of the Eighteen series, have been diligently taking place before a Special Master duly appointed by the Court. A majority of such accountings have resulted in settlements, duly approved, by which the res of particular trust funds involved have been restored altogether by more than a million dollars. Naturally, because of the importance of each accounting, the objections raised have required the taking of considerable testimony and with the legal questions raised have required time and careful consideration by the Master and the Court.

It seems to me, however, that the principle applicable to all of these accounts that have been settled and the few remaining, including the present accounting, is the same in each and that the issue now here raised is clear cut.

In substance it is whether or not a corporate trustee has violated the conditions of the trust indenture whereby the corpus of that fund in a series has been depleted and therefore such res must be restored to the fund before the accounting of that trustee can result in a proper settlement of its account.

In this case and I think in all others that have come to my attention no fraud or bad faith is indicated or charged.

There is no need to state again, in this opinion, that which has been set forth already in the careful and fair reports of the Special Master in these two accountings. In substance the Manhattan Company, referred to as the "Bank", was trustee of the Fifth and Ninth Series under similar trust agreements. It is accounting for its trusteeship in each of these series. Certain objections have been filed in these accountings and the Special Master has

dismissed some of them and sustained others.

Without opposition and by consent the issues raised by the objections in each of these two accountings have been argued at one time and one opinion will suffice, as the question is identical in each. Two orders will have to be entered.

■ The Master on ample supporting evidence has found that the trust indenture contained conditions for the protection of the bondholders and binding upon the Bank which have been violated by the Bank.

One is that the fund, after any return of collateral, should remain liquid and at par. That is, that it should contain collateral maturing within six months before or three months after the date when the bonds were destined by their terms to fall due, which, with the cash and other securities in the trust fund, should at least equal the principal amount of Prudence Bonds then issued and outstanding in the series. Failure of this condition required the entire fund to be frozen.

The other is that no collateral should be in default in payment of principal and if any was in default the trust fund was to be frozen except for the extraction of the defaulted collateral, at the same time maintaining both parity and liquidity of the fund.

The Master, after hearing all the testimony and objections, has properly found that these conditions were violated by the Bank, that is, that mortgages and cash were returned to the debtor by the Bank in violation of the first condition or at times when defaulted mortgages remained in the trust fund in violation of the second condition.

The intention reasonably shown from a reading of the trust indentures is plainly that there should be at all times in the trust fund enough collateral to pay the bonds and that such collateral should mature in time to pay them. Such was the plan of the trust based on the collateral being in good standing, but in case a certain mortgage defaulted the trust fund was not to be disturbed except to take out the defaulted mortgage and substitute a good one or other proper collateral in order to maintain parity and liquidity. The legal duty of the Bank as such trustee was to refuse the debtor's application for withdrawal or substitution of collateral unless the fund was in condition to have this done without violation of the trust contract, the principal purpose being care over the condition of the fund to meet the debtor's obligation on its bonds.

■ If the above conclusions of the Master are correct and the Bank allowed improper withdrawals, it seems to me, the sole question presented on the accounting at the present time is the restoration to the fund of such improper withdrawals. It is not a question of damage to the trust fund or benefit as claimed by the Bank at the present time. It is simply that if the trust agreement has been violated by the Bank by allowing improper withdrawal of the res from the fund even if such withdrawal was given to the debtor, nevertheless, the Bank in accounting for its trust must first restore the unlawful withdrawal before it can be heard to receive a judicial settlement of its account. This seems to me to be the only question now before the Court.

The bondholders of these series are entitled to have the res restored to the fund before questions as to benefit or damage or rights of the Bank or others can be properly considered.

Accordingly, in my opinion, much of the argument as to such questions is beside the point when the present condition of the fund is considered.

I realize that it may be more convenient to take a so-called "short cut" and consider the many surrounding circumstances and alleged rights and I do not view the recommendations of the Master as to certain proposed liens to be given to the Bank as being contrary to the view here expressed by me. It may be determined later that not only are the liens proper but that the Bank may be entitled to other and further rights. At the present time, however, there seems to me but one thing before the Court and that is: Was there improper withdrawals, as found by the Special Master on sufficient evidence, or not?

Of course, if the Master and this Court are wrong in finding the withdrawals improper, that is the end of the matter. If there has been such improper withdrawals then the bondholders of the series are entitled to have the res restored to the fund before any further discussion as to other rights, if any, takes place.

This is not a case where the Bank has duly offered to return the res to the fund or has done so. On the contrary the Bank

refuses to make such a return. In fact it claims that there was no such improper withdrawals and, if I read the brief submitted for the Bank correctly, that even if in some instance there was an improper withdrawal there is no need to return it to the fund, for first there must be considered the Bank's rights, the effect on the fund, the question of a surplus, if any. The representative of the subordinated bonds urges that their rights must also be considered in advance of the return to the fund of the res found to have been wrongfully withdrawn.

The above applies to both the Fifth and Ninth Series funds. In my opinion the res must be restored before any disposition thereof can take place.

There should be no discussion of rights in or disposition of funds which have been wrongfully withdrawn by a trustee while it fails and refuses to restore the same as found by the Master on sufficient evidence.

The Master has been very fair and reasonable in arriving at his conclusions. His report in each account should be and are in all respects confirmed and all exceptions thereto are overruled.

I do not indicate in this opinion directly or indirectly any opinion on such issues that may hereafter arise if and when the funds have been duly restored by the return thereto of the res improperly withdrawn therefrom and until then the Bank cannot be absolved from further liability as trustee of the Fifth and Ninth Series of the debtor in its accounting thereof.

Settle orders.

The reports of James G. Moore, Special Master, are as follows:

To the Honorable Judges of the United States District Court, for the Eastern District of New York:

By an order of this Court dated February 26, 1940, there were referred to me as Special Master the issues raised by the account and petition of the President and Directors of the Manhattan Company, as trustee under Trust Agreement dated April 1, 1925, securing Prudence Bonds, Series Fifth (hereinafter referred to as the "Bank"), and the objections filed thereto by Charles H. Kelby and Clifford S. Kelsey, Trustees in Reorganization of the Debtor in this proceeding (hereinafter called the "Reorganization Trustees") and by Prudence Bonds Corporation, the new corporation formed pursuant to the Plans of Re-organization confirmed in this proceeding (hereinafter called the "New Company"), and by Hilda S. Reese and George E. Eddy, bondholders. The order of reference directed me to take testimony and to hear and report on the facts and the law, with my recommendation and opinion thereon, in accordance with the usual practice of this Court.

All notices required by the order of reference were duly given and published in accordance with said order, and hearings were duly held in accordance with said notices and as directed by said order.

The issues were duly tried and the hearings duly closed, and upon all the papers and proceedings had herein, and the evidence taken at such hearings, I beg leave to report as follows:

### Historical Background

The Bank was trustee under the Trust Agreement aforesaid, between it and the Debtor in this proceeding. The Debtor was organized under the Business Corporations Law of New York in December, 1919. All of its outstanding shares were issued at the time of its organization for $50,000 cash to Realty Associates (which later changed its name to New York Investors, Inc.). The Debtor's subscribed capital of $50,000 was immediately loaned to the Prudence Company, Inc. On June 28, 1934, the Debtor filed its petition in this Court for reorganization under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207; the petition was duly approved, and the reorganization proceedings thereby commenced are still pending.

The Prudence Company, Inc., hereinafter referred to as the "Guarantor", was incorporated as an investment company under Article 7 of the Banking Law of New York, Consol.Laws c. 2, Laws 1914, c. 369 as amended, on August 22, 1919, under the name of Realty Associates Investment Corporation, and assumed the name of the Prudence Company, Inc., by authority of the Superintendent of Banks on August 18, 1921. All of its outstanding common stock and $5,000,000 par value of its preferred stock were owned by said New York Investors, Inc., and an additional $5,000,000 par value of said preferred stock was owned by the public.

The Guarantor, in the course of its business as an investment company, made loans with its own corporate funds, and took as security mortgages on improved in-

come-bearing real estate. Some of the mortgages thus received by it were delivered, together with other securities and cash, to the Debtor, which in turn delivered them to the Bank under the said Trust Agreement. Against this collateral, bonds of varying maturities, known as First Mortgage Collateral Bonds, Fifth Series, were thereupon issued by the Debtor, and, after authentication by the Bank, were delivered by the Debtor to the Guarantor, and by it sold to the public. Seventeen other issues of bonds, under seventeen similar trust indentures secured by like collateral, were issued by the Debtor, and likewise guaranteed by the Guarantor. In this way, the Debtor became the obligor on eighteen series of such First Mortgage Collateral Bonds.

Upon the approval of the Debtor's petition for reorganization, the Reorganization Trustees were duly appointed and qualified. After qualifying, they proceeded to marshal all the assets and debts of the Debtor. Some $61,000,000 of secured claims were filed by or on behalf of the holders of bonds of the said eighteen issues, and were allowed. Over $9,000,000 of unsecured claims were also filed. All other claimants were duly barred. Such proceedings were had herein that the Debtor was found to be insolvent. Thereupon the said general claimants and the shareholders of the Debtor were excluded from participation in the Debtor's assets upon reorganization. The eighteen trust indentures securing the said bond issues, including the indenture in this series, were abrogated, and the assets pledged thereunder were repledged with a new trustee for the benefit of the several series of bonds, which were thereupon modified.

The Bank having surrendered its Trust Fund to the new trustee in obedience to the order of this Court became entitled to an acquittance from this Court, and accordingly the Bank was ordered to account. The Bank appeared generally, submitted itself to the Court's jurisdiction, filed its account and prayed for a discharge.

## The Account

The account thus filed sets forth in debit and credit form the acts and proceedings of the Bank from the inception of the trust down to the close of business on August 31, 1938. The schedules annexed to the account, as amended at the trial, show, amongst other things, the collateral received, the transactions with respect to the collateral, the collateral returned to the Debtor, the bonds authenticated and cancelled, and the collateral turned over to the New Company and repledged with the new trustee.

## The Objections

The objections which raised the issues tried in this proceeding were filed by the New Company, the Reorganization Trustees and two bondholders, Reese and Eddy. In legal effect, they are all the same, and as amended at the trial may be summarized generally as follows:

(A) Amended objections numbered first and second ask disallowance of credits claimed by the Bank in schedules "B" and "E" of the account, respectively, for four mortgages aggregating $1,119,600, principal amount, and $3,090,366.89 cash, returned by the Bank to the Debtor at its request. The Objectors charge that in returning such collateral to the Debtor the Bank transcended its powers under the trust indenture, and that in so doing it was grossly negligent and careless; and

(B) Amended objection third asks the disallowance of credits in schedule "G" aggregating $8,100 for bonds in that principal amount cancelled by the Bank, in lieu of receiving $8,050 collected by the Debtor; and

(C) Amended objections numbered fourth and fifth object to the account generally, on the ground that the Bank failed to require the Debtor to fulfill its covenant to file with the Bank guarantees by the Guarantor of the underlying collateral, and that it authenticated bonds without first obtaining such guarantees. The Objectors charge by these objections that such guarantees were prescribed elements of the collateral, without which the trust should never have been initiated, the bonds should never have been authenticated and sold to the public, and the acts and proceedings accounted for should never have been transacted.

■ A. The first and second objections raise for initial consideration the questions: Did the Bank transcend its powers by returning said mortgages and cash to the Debtor, and was it grossly negligent and careless in so doing?

The trust indenture is multipartite; the Bank and the Debtor were signatories. Each bondholder became a party by the acceptance of his bonds, and became charged with knowledge of the terms of the in-

denture and entitled to its benefits. By the scheme of the indenture the Debtor conveyed to the Bank five different classes of collateral. Classes (a), (b) and (c) consisted of real estate securities, such as mortgages, certificates of mortgages and the like; class (d) comprised investments, legal for savings banks in the State of New York; and class (e) cash, United States, state and municipal bonds. The sum of the securities of all such classes was always to be at least equal to the amount of the Fifth Series Bonds outstanding; the (d) and (e) securities to be valued at market; and the (a), (b) and (c) securities to be valued at face, whether or not any of them were overdue or in default in either interest or principal. All collateral, collectively known as the "Trust Fund", was to be held by the Bank for the equal and pro rata benefit and security of the Fifth Series Bondholders.

Until the occurrence of an event of default, as defined in the Trust Agreement, the Debtor enjoyed extraordinary liberties to deal with the underlying collateral. It had the right, among others, subject to the limitations hereinafter discussed, to substitute one security for another, and whenever the collateral valued as above described exceeded the aggregate principal amount of the bonds outstanding, to withdraw such excess. The applicable provisions of the Trust Agreement are as follows:

"Section 6. *Substitution and withdrawal of securities; etc.*—Unless there shall exist an event of default under which the Trustee may take action as hereinafter provided, the Corporation may from time to time withdraw any bonds, mortgages or other securities or cash from the Trust Fund (1) by substituting therefor bonds, mortgages or other securities or cash authorized by Section 1 of this Article equal in amount or value as prescribed by Section 4 of this Article to the unpaid principal of the bonds, mortgages or other securities or cash withdrawn; (2) by written application of the corporation to the Trustee for such withdrawal at any time the principal amount of the Trust Fund may exceed the par value of the Prudence-Bonds then issued and outstanding hereunder. The Trustee will accordingly deliver the bonds, mortgages or other securities or cash so withdrawn, with any necessary assignments thereof,

(First proviso)

"*provided there shall remain in the Trust Fund after any such withdrawal, bonds, mortgages or other securities deposited under paragraphs (a), (b) and (c), Section 1 of this Article, sufficient in principal amount maturing during the six months' period immediately preceding or the three months' period immediately following and including the maturity date of any Prudence-Bonds then issued and outstanding hereunder, when added to the value of securities and cash deposited under paragraphs (d) and (e), Section 1 of this Article (which are available for any period), to at least equal the principal amount of Prudence-Bonds then issued and outstanding hereunder maturing within such period,*

(Second proviso)

"*and further provided that if and as long as any securities deposited in the Trust Fund under paragraphs (a), (b) or (c), Section 1 of this Article, shall be in default in the payment of principal, the Corporation shall be permitted to withdraw only such securities deposited under said paragraphs (a), (b) or (c), as shall be in default (except in connection with the redemption or final payment at maturity of any other securities not in default deposited under such paragraphs).*

"Upon the delivery to the Trustee for cancellation of any or all of the Prudence-Bonds secured hereunder with all unmatured coupons attached thereto, or cash equal to such coupons as are not delivered (or in lieu of any thereof, a certificate by an officer of the Corporation, approved by an officer of The Prudence Company, Inc., that certain of such bonds, with the coupons, if any, belonging thereto, matured at a date in excess of six years prior to the date of said certificate and have not been presented for payment), and unless there shall exist an event of default under which the Trustee may take action as hereinafter provided, the Corporation shall be entitled to withdraw from the Trust Fund and receive from the Trustee, in accordance with the provisions of the preceding paragraph of this section, bonds, mortgages or other securities or cash equal in amount and value to the principal amount of the Prudence-Bonds so actually presented for cancellation or represented by such certificate." (Italics, paragraphing and numbering of italicized matter mine.)

These are the only provisions of the indenture which permitted collateral once received by the Bank to be returned to the Debtor.

Two definite conditions were imposed. The first, found in the first proviso (italicized above), was that the fund, after any such return of collateral, should remain liquid and at par; that is to say, it should contain (a), (b) and (c) collateral maturing within six months before, or three months after, the date when Fifth Series Bonds were destined by their terms to fall due, which, with the cash and (d) and (e) securities in the Trust Fund, should at least equal the principal amount of Prudence Bonds then issued and outstanding. Failure of this condition required the entire fund to be frozen. The second condition, found in the second proviso (italicized above), was that no (a), (b) or (c) collateral should be in default in the payment of principal. If any collateral was in default, the Trust Fund was to be frozen except for the extraction, while maintaining both parity and liquidity, of the defaulted collateral. These are the conditions which the Objectors charge were violated; that is to say, it is claimed that the mortgages and cash described in the objections were returned to the Debtor, in violation of the first proviso, or at times when defaulted mortgages remained in the Trust Fund, in violation of the second.

The first proviso, which counsel have referred to for the sake of convenience as the "parity and liquidity proviso", required that the collateral should become liquid substantially contemporaneously with the maturing of the bonds in an amount sufficient to pay each maturity. The intention was quite evidently that there should be in the Trust Fund enough collateral to pay the bonds, and that such collateral should mature in time to pay them; that is to say, the intake was intended to be timed and measured to match the outgo. Such was the scheme of the trust, and it was calculated to work so long as the collateral was in good standing, for the Debtor was without any other resources to meet its obligations. The scheme was expected to fail to work the moment a mortgage defaulted in any principal payment. Hence the second proviso, that the Trust Fund was not to be disturbed after such a default, except to extract the defaulted mortgage, upon substituting a good one, or other eligible collateral, if necessary to maintain parity and liquidity.

The Guarantor could not be expected to be of any help in paying the bonds at their several maturities, for its obligation was to make good the Debtor's principal defaults only after eighteen months.

Keeping the Trust Fund in parity and in liquid condition to meet the periodically maturing bonds was the plain duty of the Bank under the Trust Agreement. This the Bank disclaims, but it seems clear to me that the use of the word "permitted" in the second proviso is consistent only with the construction that it had the duty to give permission and to grant the Debtor's applications for the withdrawal or substitution of collateral only when a clear right existed. In my opinion, the true intent and meaning of the trust indenture was that the Bank should watch over the Trust Fund, seal it against any unchartered incursion by the Debtor and keep it in condition to meet the Debtor's obligations on its bonds.

If the bondholders read the indenture before they became parties to it, this is how it must have seemed to them; if they did not read it, which is not unlikely, they at least knew that they had the firm obligation of the Debtor to pay the principal sums of their bonds at maturity, and that the Bank held collateral to secure such payment.

Even without the liquidity clause, the scheme as a whole shows the intention to liquidate the bonds out of the collateral and to create real and not gossamered obligations for the Debtor.

The construction outlined above is sustained by the conduct of the parties. It was the custom of the Debtor and the Bank to make monthly comparisons of their respective records with respect to the parity and liquidity of the Trust Fund. Monthly the Debtor would write the Bank a letter like that of June 6, 1931, viz:

"We enclose herewith, statements showing total deposits, total authentications, and credit existing in the Fifth Series and Ninth Series Trust Funds as at May 31st, 1931.

"If these figures do not agree with your records we shall be pleased to have you advise us accordingly."

The enclosure referred to, known as a "reconciliation statement", would set forth the maturity dates of the outstanding bonds; the maturities of the mortgage collateral matched therewith; the past due

collateral; the cash in the Trust Fund; and strike a balance.

Until June 8, 1931, the Bank would reply substantially in the following form:

"This will advise you that we have received your communication of June 6th, 1931 enclosing statements disclosing the status of the 5th and 9th Series Trust Funds as at May 31, 1931.

"A comparison of these statements with our records reveals that they are in agreement."

After June 8, 1931, the record does not disclose any account affirmatively stated like the letter just quoted, but neither does it show, any disagreement.

With the records thus reconciled monthly, it was customary for the Debtor to write to the Bank a letter substantially in the form of its letter of October 2, 1931, reading as follows:

"We have, at present, on deposit in the Trust Fund created by the above Trust Agreement, $460,300 in cash against which no Prudence-Bonds have been authenticated.

"We hereby request the withdrawal of this sum, and ask that you send a check for this amount to our Brooklyn office."

The Bank would usually comply by sending the Debtor the cash or security requested. However, in reply to the letter just quoted the Bank wrote its letter of October 3, 1931, as follows:

"Pursuant to your letter dated October 2nd in which you request the withdrawal of excess cash from the Fifth Series Trust Fund, we enclose our check to your order for $258,400 which amount represents the excess.

"Kindly acknowledge receipt of this check by signing the enclosed carbon copy of this letter."

In this instance the Bank exercised its power of supervision, scaled down the Debtor's request, and "permitted" only $258,400 of the $460,300 cash requested to be withdrawn.

In this manner, the four mortgages described in the first objection, and the cash set forth in the second objection, were returned to the Debtor.

The first of the mortgages, No. 736, in the principal sum of $275,000, was returned to the Debtor on December 5, 1928; the second, No. 565, in the principal sum of $29,000, was returned on March 12, 1929; the third, No. 460, for $700,000 was returned on December 31, 1928; and the fourth, No. 559, in the principal sum of $115,600, was returned on December 19, 1931. The first two were returned in substitution for cash equal to the face principal amount of the mortgages; the third and fourth as excess collateral. On the dates when these mortgages were returned, other mortgages were in default in the payment of principal.

The dealings between the Bank and the Debtor were such that the Trust Fund was periodically restored to its lawful state; a sufficient amount of eligible and liquid securities matched the outstanding Prudence Bonds. This periodic restoration was shortlived; but while it lasted was complete and legally accomplished. The last of such restoration dates was June 30, 1931. On that date, as the Bank's counsel puts it, the Trust Fund was "sweet." It was in the condition, both as to parity and liquidity, which the bondholders bargained for.

The first three mortgages withdrawn were withdrawn before June 30, 1931, and it is my opinion that whether these withdrawals were authorized by the indenture or not, no ascertainable diminution of the Trust Fund resulted. Accordingly, it is my opinion that the first objection, insofar as it relates to the return of mortgages Nos. 736, 565 and 460, should be dismissed.

If this be the correct conclusion, the Bank's further grounds for dismissing the objection to the return of these mortgages may not be important; but I think it should be said in passing that the substitution of cash for the first two mortgages withdrawn should not legalize the transaction, for the cash so substituted was itself later withdrawn. The account shows that despite the deposit of $275,000 cash for mortgage No. 736 on December 5, 1928, there was only $17,341.66 cash on hand on January 30, 1929. Likewise, although $29,000 was deposited on March 12, 1929, in substitution for mortgage No. 565, only $16,750 remained on April 13, 1929. The objectors claim that the substitution of cash was a device adopted by the Debtor to enable it to remove a good mortgage while a defaulted one remained, in circumvention of the second proviso. It is my opinion that such was the case, and by this device the good mortgage, and later the cash, were returned to the Debtor, while the less valuable defaulted mortgage

stayed in the fund. Since the indenture permitted only the defaulted mortgage to be returned to the Debtor, the transaction was illegal.

■ The return of the fourth mortgage presents a different picture. The Trust Fund on the day of its return was, and continued to be, in wretched condition. Other mortgages, aggregating $666,535 principal amount, were in default; yet mortgage No. 559 was returned as excess collateral.

Justification for the return of mortgage No. 559 as excess is sought under section 4 of article I, which provides: "In determining and computing the aggregate principal amount of the Trust Fund at any time, there shall be included all securities deposited under paragraphs (a), (b) and (c), Section 1 of this Article, at their face principal amount, irrespective of whether any thereof are overdue or in default as to principal or interest (but less any payment shown to the Trustee to have been made on account of principal thereof), and all bonds and other securities deposited under paragraphs (d) and (e) thereof at their market value as of the date of deposit."

Thus by computing as part of the Trust Fund over three-quarters of a million dollars in defaulted mortgages (for mortgage No. 559 was itself in default), the fiction of excess collateral was arrived at. Despite the provisions of the indenture just quoted, it is my opinion that these mortgages were required to be eliminated, both as to past and future installments, in determining the Trust Fund liquidity. A mortgage in default as to one installment of principal could not reasonably be expected to be good as to future installments of principal, and therefore such future installments were not "maturing" in the sense of either the spirit or the letter of the indenture. These mortgages could not be depended upon to become liquid at the time of the maturities of the bonds matched against them. To hold otherwise would endow the language of the trust indenture with refinements too subtle to be practical. Properly calculated, there was no excess.

■ The Bank claims that at the time of the withdrawal of mortgage No. 559 it had no knowledge that mortgage No. 449 was under foreclosure until it received constructive notice by the filing of lis pendens on December 30, 1931, twelve days after the withdrawal. The Guarantor, which verified the complaint, was the Bank's agent. Knowledge will be imputed to the Bank.

I recommend that the first objection, insofar as it relates to mortgage No. 559, be sustained, and that the credit claimed by the Bank for the return of that mortgage to the Debtor be disallowed.

■ Out of the $3,090,366.89 in cash which was returned by the Bank to the Debtor as set forth in the second objection, $2,784,393.53 was returned as excess collateral, and $305,973.36 was returned against bonds delivered to the Bank by the Debtor for cancellation. With respect to all items of cash returned to the Debtor before June 30, 1931, what was said as to the first three mortgages applies here. The Trust Fund was in balance on June 30, 1931. All disputed items of cash returned to the Debtor before that date resulted in no ascertainable diminution of the Trust Fund. I recommend that the objection as to all such items be dismissed, and that all such credit items be allowed.

■ After June 30, 1931 the cash returned to the Debtor aggregated $949,965. On the dates of the withdrawal of each item of cash constituting that sum, mortgages in the Trust Fund were in default in the payment of principal. The Trust Fund after June 30, 1931, to adapt counsel's metaphor, was "sour." Of this cash, $864,140 was extracted as excess collateral, and the balance of $85,825, in substitution of bonds surrendered for cancellation.

The Bank argues that there was no prohibition against the withdrawal of cash. As I have said before, the practical operation of the scheme of the trust was that parity and liquidity should at all times be maintained. The scheme could not possibly work if liquid collateral was extracted while law suits on defaulted mortgages remained. The indenture (art. I, sec. 6) is very definite; the Debtor was to be permitted to withdraw "only such securities deposited under said paragraphs (a), (b) or (c) as shall be in default. * * *"

And, of course, the scheme as it was operated did not work, for on April 2, 1932, the Debtor defaulted. As late as last year, $1,783,980 was still due the public holders of Fifth Series Bonds.

On January 2, 1932 the Guarantor announced the Debtor's proposed default and bonds thereafter presented for payment at maturity were returned with a notice to

the bondholders, of which the Bank had knowledge, that currently maturing bonds would not be paid until eighteen months later. It reads as follows:

"Believing it to be to the best interest of all concerned, this bond will not be paid at the present time. The bond is secured by first mortgages and owners are encountering great difficulty in collecting rents and making principal payments.

"Foreclosure, while in some cases necessary, should not be resorted to indiscriminately. Expert study of each situation and a period of waiting for a clarification of the financial situation are necessary. It is in anticipation of periods such as this that a conservative guarantor of mortgage investments reserves a period of eighteen months after the due date in which to collect the principal.

"Under the terms of our guaranty interest is to be paid at the rate guaranteed on each interest date. To avail yourself of this right, you may present this bond at any of our offices on each interest date for the payment of six months' interest at the rate guaranteed and the payment when made will be endorsed on the bond.

"If you desire, you can deposit the bond with us and we will issue a transferable receipt, holding the bond for your account. If the bond is deposited with us, the payment of interest will be effected by check mailed to you.

"In any event, it is desirable that you furnish us with your name and the address to which mail concerning this bond may be sent so that you may be promptly notified when payment will be made.

"The Prudence Company, Inc."

The Bank argues that the Debtor and the Guarantor could not be expected to use their cash resources to stem the tide. If the scheme of the trust was as I have stated it to be, the Bank had no right to permit the bondholders' cash to be used for that or any other purpose, except to keep the Trust Fund liquid. In short, the Bank should not have permitted the withdrawals.

After January 1, 1932, instead of refusing the Debtor's applications for the withdrawal of cash, the Bank seems to have made it easier. Before that date it was the practice, in reconciling their accounts and striking a balance, to deduct past due mortgage collateral. On that day this procedure was changed; no deduction for past due collateral was thereafter made. Such collateral was included in the Trust Fund as if it were a maturing asset. The fiction of excess cash was continued. Even after the bonds defaulted, over $6,000 of so-called excess cash was returned to the Debtor.

The Bank argues that no damage resulted to the Trust Fund even after June 30, 1931. In fact, it makes the claim that the Trust Fund benefited by the evisceration. It arrives at this conclusion by attempting to show that the present-day values of the residue of real estate covered by the defaulted mortgages, together with the principal cash received by the New Company from said mortgages, aggregate more than the so-called excess cash extracted after June 30, 1931. But the answer is plain. Since there was no excess collateral, neither the cash nor the mortgages could have been extracted legally; both should have remained in the Trust Fund. And even if both had been permitted to remain, it is very doubtful if the trust fund would have been rendered solvent. [See reports of August 1, 1936 and March 11, 1937.] Besides, the present-day values of the properties reflect an additional investment of servicing costs and skill by the New Company. Accordingly, the proffered evidence of present-day values was excluded.

The sum of $85,825 of the $949,965 aforesaid was returned to the Debtor in exchange for bonds which were cancelled. Such a transaction by the terms of the indenture, was required to be "in accordance with the provisions of the preceding paragraph of this section. * * *" (Sec. 6, Art. I above quoted). With the Trust Fund out of balance as to parity and liquidity the Debtor was not entitled to surrender bonds for cash. The bonds thus surrendered must be considered an investment of the Bank's own funds.

Accordingly I recommend that the second objection as to the $949,965 of cash returned to the Debtor after June 30, 1931, be sustained, and that the credit items claimed by the Bank for the cash so returned be disallowed.

Upon restoration of the sum aforesaid, the Bank will be entitled to a lien for $85,825 upon the Trust Fund, subordinate to the publicly held bonds, and in parity with the subordinated bonds.

No finding of negligence on the part of the Bank will be made; no bad

faith will be found. The Bank exceeded its powers in returning the collateral in question, and in so doing, acted deliberately. It is a matter of no consequence whether it did so carelessly or painstakingly.

B.

The third objection relates to four credit items in schedule "G" of the account, viz.:

| | |
|---|---|
| February 19, 1932 | $1,800 |
| March 11, 1932 | 3,800 |
| May 11, 1932 | 1,000 |
| August 15, 1932 | 1,500 |
| | $8,100 |

These credits are claimed for bonds of like principal amount cancelled by the Bank. The Debtor had collected $8,050 principal from bonds and mortgages in the Trust Fund. Instead of turning this money over to the Bank, it delivered to the Bank, and the Bank accepted for cancellation, the said $8,100 of Fifth Series Bonds, pursuant to article III, section 1(i). It is conceded that the bonds were of current maturities.

Under article I, section 5, and article III, section 1(i), the Debtor had the right to collect and retain the principal payments on the collateral, and to deliver to the Bank in lieu thereof an equal face principal amount of Prudence Bonds maturing within six months. As to the first two items objected to, I think the transaction cannot be deemed unauthorized, even though it enabled the Debtor to keep cash it could not lawfully have withdrawn after deposit in the Trust Fund.

The last two transactions complained of, aggregating $2,500, were distinctly unauthorized. The Debtor by that time had defaulted. Article IV, section 1(d), provided: "In the event of the inability of the corporation to pay at maturity, or within eighteen months thereafter, the principal and interest of any Prudence Bonds issued and outstanding hereunder, the corporation shall have the right during such period to pay in part, pro rata, the principal past due and unpaid upon all such Prudence Bonds, with the accrued interest on the amount so paid."

The claim that, despite the default of the Debtor, the general reservation of rights until the Guarantor's corresponding default eighteen months later [art. IV, 1(d)] included the right to pay off bonds is, in my opinion, untenable. Such reservation is limited to such rights, the exercise of which would rehabilitate the Trust Fund during the eighteen months in question; and to remedy its default and not to aggravate it. These rights included the right to make payment on the outstanding bonds pro rata, but not the right to pay and discharge some bonds at the expense of the others. The right of pro rata payment was exclusive of all other rights with respect to payment. The Bank should not have accepted these bonds.

However, to get the cash which the Debtor collected, the Bank would have had to make a demand and institute suit. As has already been demonstrated, the Trust Fund at the time was closed against any claims of the Debtor. There was therefore no opportunity for set-off available to the Bank; no way in which the Bank could have exacted payment except by demand and suit. Under article V of the indenture, the Bank was not required to bring such suit without the indemnity therein prescribed. The Bank was thus clothed with full immunity. Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541, affirmed 257 App.Div. 950, 14 N.Y.S.2d 147, affirmed 282 N.Y. 652, 26 N.E.2d 801. Accordingly, I recommend that this objection be dismissed.

C.

These objections raise the question whether any of the acts and proceedings accounted for should ever have been transacted, because the Bank had failed to enforce the following covenant of the Debtor contained in the indenture (art. III, sec. 1-f): "That it will deposit with the Trustee a guarantee of The Prudence Company, Inc., guaranteeing payment of interest semi-annually when due, and of principal within eighteen months after the same becomes due, according to the terms of each bond, mortgage and other security in the Trust Fund under paragraphs (a), (b) and (c), Section 1, Article I hereof."

The guarantee was not deposited; it was not demanded by the Bank; nor was any proceeding taken by the Bank to enforce the covenant. Not having the guarantee, the Bank could not bring proceedings against the Guarantor, for the defaults of

income and principal on the underlying mortgages.

The Objectors claim that the guarantee was a necessary element of the collateral; that it should have been obtained before any bonds were authenticated; that it should have been enforced in accordance with its terms; and that a proper claim should have been filed in the Guarantor's reorganization proceeding which, according to the Objectors, would have resulted in the distribution of dividends in that proceeding.

Article I, section 1, which sets forth the contents of the Trust Fund, does not specify the guarantee as a part of such contents. The Bank, therefore, cannot be held to account for having authenticated the bonds and initiated the acts and proceedings accounted for.

The question remains whether it should have tried to enforce the covenant. Of course, it should; but here again, since there was no prescribed demand and indemnity, the Bank is clothed with immunity.

The Objectors proved the dividends which had been paid in the Guarantor's reorganization proceeding. They claim that if the Bank had obtained such guarantees and filed a claim thereon in such reorganization proceeding, it would have received a like distribution. This does not follow. There was no bankruptcy distribution in that proceeding, but a plan of reorganization under former Section 77B of the Bankruptcy Act. In view of the tremendous increase in the aggregate claims which such guarantees, if obtained, would have entailed, it does not follow that the same plan would have been adopted by the consent of the creditors, or that it would have been found fair or feasible by the Court.

I recommend that objections fourth and fifth be dismissed.

## Motions to Dismiss

The Bank moves to dismiss the objections on the grounds that the Objectors' claims are barred by the Statute of Limitations of the State of New York, and that the New Company and the Reorganization Trustees are not the proper parties in interest. The motions should be denied as to both grounds on the authority of the Manufacturers Trust Company v. Kelby et al., 2 Cir., 125 F.2d 650, which is still the law of this case.

## Findings of Fact and Conclusions of Law

I make, separately stated and numbered, the following findings of fact and conclusions of law:

### Findings of Fact

1. Prudence Bonds Corporation, the Debtor herein, was organized on or about December 9, 1919, under the Business Corporations Law of New York, Consol.Laws, c. 4, and all of its outstanding shares were issued at the time of its organization for $50,000 cash to Realty Associates.

2. The Debtor's subscribed capital of $50,000 was immediately loaned to the Prudence Company, Inc.

3. The Prudence Company, Inc., the Guarantor herein, was incorporated as an investment company under article 7 of the Banking Law of New York on or about August 22, 1919, under the name of Realty Associates Investment Corporation, and on or about August 18, 1921, changed its name to the Prudence Company, Inc., by the authority of the Superintendent of Banks; all of its outstanding common stock and $5,000,000 par value of its preferred stock were owned by New York Investors, Inc., and an additional $5,000,000 par value of said preferred stock was owned by the public.

4. New York Investors, Inc., was organized on or about November 2, 1901, under the Business Corporations Law of New York, Laws 1892, c. 691, Laws 1895, c. 671, under the name of Realty Associates, and on or about January 19, 1929, changed its name to New York Investors, Inc.; it was the parent corporation of both the Debtor and the Guarantor.

5. During the period from on or about January 15, 1920, to on or about February 2, 1931, the Debtor became the obligor on eighteen series of self-styled first mortgage collateral bonds under eighteen separate trust agreements in the following manner:

Certain bonds and mortgages and other securities acquired by the Guarantor with its own corporate funds, together with various sums of cash, were sold, assigned, transferred, conveyed and delivered by the Guarantor to the Debtor, which the Debtor in turn sold, assigned, transferred, conveyed and delivered to various trust companies, as trustees under written trust agreements made by the Debtor to the said trust companies; thereupon bonds of various denominations and staggered maturi-

ties were, from time to time, signed and sealed by the Debtor, endorsed with the guaranty of the Guarantor, authenticated by the respective trust companies as such trustees and delivered to the Debtor; the Debtor thereupon delivered the said first mortgage-collateral bonds to the Guarantor in consideration for the bonds and mortgages and other securities and cash aforesaid which the Guarantor had sold, assigned, transferred, conveyed and delivered to the Debtor; the bonds thus created were then sold to the public by the Guarantor.

6. Among the trust agreements made by the Debtor to secure its eighteen series of first mortgage-collateral bonds was the Trust Agreement dated April 1, 1925, made to the President and Directors of the Manhattan Company (herein called the "Bank") securing the Debtor's first mortgage-collateral bonds, Fifth Series; the Trust Agreement is herein referred to as the "Trust Agreement."

7. Physically attached to the Trust Agreement is a written guaranty between the Guarantor and the Bank, whereby the Guarantor unconditionally agreed with the Bank for each and every person, firm and corporation, who should at any time thereafter hold or own any of said Prudence Bonds, Fifth Series, to guarantee the due and punctual payment by the Debtor of the interest on each and every one of the bonds as and when the same became due and payable, and the payment of the principal of the bonds within 18 months after the same by their terms became due and payable, or forthwith when due by declaration; the Guarantor further agreed to execute its covenant of guarantee upon each of the bonds in words and figures following:

"In consideration of the purchase of the within bond, The Prudence Company, Inc., hereby unconditionally guarantees to the holder thereof, the due and punctual payment by Prudence-Bonds Corporation of the interest thereon as the same becomes due and payable and also the payment of the principal thereof within eighteen months after the same by its terms becomes due and payable, or forthwith when due by declaration, together with interest thereon after maturity at the same rate until payment of principal is offered.

"By the acceptance of the within bond, the holder thereof agrees to the terms and conditions of this guarantee and to all the provisions and conditions of the within mentioned Trust Agreement, including those limiting the exercise by the Trustee of rights and remedies thereunder upon default.

The Prudence Company, Inc.,
By
——————— ——————————."

8. In addition to the Trust Agreement securing the First Mortgage-Collateral Bonds, Fifth Series, the Debtor executed seventeen other trust agreements substantially similar in scheme which had annexed thereto an agreement of guaranty made by the Guarantor in substantially similar terms. The Bank was also trustee of the Debtor's First Mortgage-Collateral Bonds, Ninth Series, under Trust Agreement dated March 1, 1927.

9. Prior to January 2, 1932, the interest and principal on the bonds of all series were paid when due, but on or about January 2, 1932, the Guarantor announced the Debtor's proposed default, and bonds of all series thereafter presented for payment at maturity were returned to the bondholders with a notice, of which the Bank had knowledge, to the effect that currently maturing bonds would not be paid until payment was due under the guaranty, to wit, eighteen months thereafter.

10. After January 2, 1932, the Debtor became in default in the payment of principal due on all of its outstanding bonds as they severally matured and so remained in default.

11. The Debtor failed to pay the principal due on Fifth Series Bonds maturing April 1, 1932, and thereafter; and the Guarantor failed to answer under its guaranty for the debtor's default.

12. On June 29, 1934, the Debtor filed in this Court its voluntary petition for reorganization under Section 77B of the Bankruptcy Act and in said reorganization proceedings was subsequently found to be insolvent.

13. On February 1, 1935, the Guarantor filed in this Court its voluntary petition for reorganization under Section 77B of the Bankruptcy Act and in said reorganization proceedings was subsequently found to be insolvent.

14. On January 7, 1935, the parent Company, New York Investors, Inc., filed in this Court its voluntary petition for reorganization under Section 77B of the Bankruptcy Act and in said reorganization proceedings was subsequently found to be insolvent.

15. By order made and entered herein on June 29, 1934, the Debtor's petition for reorganization was approved as properly filed under Section 77B of the Bankruptcy Act, and Charles H. Kelby and Clifford S. Kelsey were duly appointed temporary trustees of the Debtor.

16. By order made and entered herein on July 31, 1934, the appointment of Charles H. Kelby and Clifford S. Kelsey, as trustees, was made permanent.

17. Charles H. Kelby ånd Clifford S. Kelsey duly qualified as trustees of the Debtor and have ever since been and now are acting in that capacity.

18. The orders of June 29, 1934, and July 31, 1934, vested the trustees of the Debtor with title to all of the property of the Debtor within the meaning of the Bankruptcy Act, with the powers of a trustee appointed pursuant to Section 44 of the Bankruptcy Act, 11 U.S.C.A. § 72, the powers of a receiver in equity to the extent consistent with Section 77B, and with the power to institute, prosecute, become party to, intervene in, compromise or defend in any Court or before any tribunal suits or actions in law or equity or otherwise, which in their judgment may be necessary or appropriate for the recovery or protection of the properties or rights of the Debtor.

19. At the time the Debtor filed its petition for reorganization there were in the eighteen series of bonds approximately 83,000 bonds outstanding held by approximately 30,000 holders residing in the State of New York and elsewhere through the United States and in foreign countries; a large number of bonds were in bearer form, the names and addresses of the holders of the bearer bonds were mostly unknown, and a substantial number of the bonds were held by the savings bank type of investor with limited means and limited investment experience; upon the sale or transfer of a Prudence Bond of any Series, a new bond was not issued or authenticated.

20. As of December 31, 1935, the Debtor was obligated on its eighteen series of first mortgage-collateral bonds as follows:

| Series | Unpaid principal, with accrued interest |
|---|---|
| A | $ 552,565.22 |
| AA | 1,845,210.76 |
| Third | 4,069,983.88 |
| Fourth | 1,322,162.03 |
| Fifth | 2,763,911.27 |
| Sixth | 3,394,899.50 |
| Seventh | 5,241,706.50 |
| Eighth | 4,746,979.42 |
| Ninth | 2,998,737.02 |
| Tenth | 1,238,977.08 |
| Eleventh | 1,164,083.34 |
| Twelfth | 4,818,103.29 |
| Thirteenth | 5,428,427.47 |
| Fourteenth | 5,278,468.71 |
| Fifteenth | 5,298,340.94 |
| Sixteenth | 4,268,911.67 |
| Seventeenth | 4,923,187.50 |
| Eighteenth | 2,495,184.73 |
| | $61,849,840.33 |

21. In the course of the reorganization proceedings the Court by order made and entered herein on April 27, 1937, found that the Debtor was insolvent and that the fair value of the collateral securing each of the eighteen series of bonds was less than the principal amount of the outstanding bonds and accrued unpaid interest thereof, and that the debtor, its stockholders and general creditors, had no equity in the collateral in any Series.

22. Separate plans of reorganization for each of the eighteen series and a general plan of reorganization were duly proposed, and after amendment were duly found to be fair and feasible, and were duly accepted by the bondholders, and were duly confirmed in this proceeding.

23. A general plan of reorganization was likewise confirmed in this proceeding and provided for the formation of a new corporation under the Stock Corporation Law, Consol.Laws c. 59, and Section 9-b of the General Corporation Law of New York, Consol.Laws, c. 23, the issuance of its entire capital stock to voting trustees, and the issuance to bondholders of voting trust certificates and voting trust scrip, representing its entire capital stock.

24. The said general plan also provided for the assumption by said new corporation of all the first mortgage-collateral bonds of the Debtor reorganized in the proceeding and as modified therein.

25. By the terms of said general plan all the books and records of the Debtor and all of the assets and property of the Debtor pledged to secure any of the outstanding first mortgage-collateral bonds of the Debtor were transferred to and vested in said new corporation.

26. The Plans of Reorganization as confirmed herein provided for an extension of

the maturity of the bonds and a change in the interest provisions.

27. After the Plans of Reorganization were approved, the New Corporation was duly organized by the filing of its certificate of incorporation in the office of the Secretary of State of the State of New York on or about February 8, 1938.

28. By order made and entered herein on April 5, 1938, the New Corporation was authorized and directed to take over and perform the servicing and management of the collateral underlying the eighteen series of bonds, which order further provided in part as follows:

"14. * * * That the above named Corporate Trustees and each of them upon compliance with the terms and provisions of this order shall be and they hereby are freed and discharged from the performance of any further duties under the respective Original Trust Agreements from and after the respective dates of such compliance with the terms and provisions of this order, except (a) to render their final accounts in this proceeding and (b) to assign, transfer and deliver pursuant to the further order of this Court the collateral underlying the said respective Series of Bonds to such trustee as may be designated to act under the Supplemental Trust Agreement provided for in the said separate Amended Plans of Reorganization for Prudence-Bonds Corporation and (c) to take such action in respect to said collateral as this Court may hereinafter from time to time, authorize and direct."

29. By order made and entered herein on April 13, 1938, the Voting Trust Agreement provided for by the General Plan of Reorganization was approved, and thereafter and pursuant to said order the Voting Trust Agreement was executed by and between the Reorganization Trustees, the Voting Trustees appointed by the Court and the New Corporation, and the entire capital stock of the New Corporation was deposited with the said Voting Trustees.

30. By order made and entered on April 27, 1938, to make effective, consummate and carry out the confirmed Plans of Reorganization, this Court approved a general form of modified or Supplemental Trust Agreement to be executed by the New Corporation to City Bank Farmers Trust Company, as trustee, in respect of each of the eighteen series of bonds.

31. By said order of April 27, 1938, the Bank, as well as the other trustees (except the Chemical Bank & Trust Company) were authorized and directed to forthwith and with all convenient speed prepare and file an account of their respective acts and proceedings under the original Trust Agreement pertaining to the Fifth and Ninth Series of Bonds, and to make an appropriate application for the judicial settlement of said accounts.

32. By order made and entered herein on June 6, 1938, a form of Supplemental Trust Agreement in the Fifteenth Series Prudence Bonds was likewise approved, and Chemical Bank & Trust Company, as trustee of that series, was likewise directed to account.

33. No new bonds were issued or authenticated to make effective, consummate and carry out the Plans of Reorganization confirmed herein; the changes or modifications of the bonds were contained in an allonge executed by the New Corporation and attached to each bond.

34. During the months of August and September, 1938, the trustees under the original Trust Agreements securing the eighteen series of bonds appeared generally herein and submitted themselves to the jurisdiction of the Court, and filed the accounts of their respective acts and proceedings as such trustees since the inception of their respective trusts, and respectively petitioned this Court for an order taking, determining, allowing and judicially settling their accounts and releasing and discharging them of and from any and all responsibility with respect to each and all of their acts and proceedings as such trustees under the Original Trust Agreements, and with respect to all matters contained in their accounts.

35. Upon the respective accounts and petitions, the Court duly directed that all bondholders and parties in interest show cause why the relief prayed for should not be granted, and that objections, if any, to said accounts, separately stated and numbered, should be verified and filed with the Clerk of the Court on or before October 18, 1938.

36. On or about October 2, 1939, the New Corporation and the Reorganization Trustees, jointly and severally, on their own behalfs, and on behalf of the bondholders, filed herein detailed, separately stated and numbered, verified objections to the accounts of each of the trustees under the Original Trust Agreements, except to the account of the trustee of the Fifteenth Series, in which series the time to file ob-

jections had been extended and has not yet expired, and on or about the same date objections to the accounts of some of the said trustees were filed herein by individual bondholders.

37. The Bank duly filed its account on September 8, 1938; the Bank had not at any time or in any other Court or otherwise, accounted for its acts and proceedings as trustee until it filed its account herein.

38. Thereafter and in due time objections to the Bank's account were filed herein by the New Corporation and the Reorganization Trustees, jointly and severally, on their own behalfs, and on behalf of the Fifth Series Bondholders, and by Hilda S. Reese and George E. Eddy, bondholders; at the trial, the account and objections were duly amended.

39. The Court, the Reorganization Trustees, the New Corporation and the bondholders had no knowledge of the facts alleged in the objections to the Bank's account until after the Bank filed its account.

40. At all times mentioned in the objections to the trustee's account, Objector George E. Eddy was and still is the owner and holder of Fifth Series Bonds.

41. On September 12, 1933, Hilda S. Reese became a holder of a $1,000 Fifth Series Bond, which she still owns.

42. Each bond and mortgage sold, assigned, transferred, conveyed and delivered by the Debtor to the Bank was so sold, assigned, transferred, conveyed and delivered pursuant to the provisions of the Trust Agreement of each respective series, and by physical delivery of the bond and mortgage, accompanied by a separate written instrument of assignment executed by the Debtor to the Bank as such trustee.

43. Each bond, note or other evidence of indebtedness, mortgage certificate and other security (except cash), sold, assigned, transferred, conveyed and delivered by the Debtor to the Bank was so sold, assigned, transferred, conveyed and delivered pursuant to the provisions of the Trust Agreement by physical delivery of each said security, accompanied by written endorsement of the Debtor or by separate written instrument of assignment executed by the Debtor to the Bank, as such trustee.

44. Cash forming part of the Trust Fund was transferred and delivered by the Debtor to the Bank, pursuant to the provisions of the Trust Agreement, by physical delivery of the cash.

45. When a bond and mortgage or other security (except cash) was returned by the Bank to the Debtor, it was assigned, transferred, conveyed and delivered by the Bank to the Debtor by written instrument of assignment and by physical delivery of the security returned.

46. Under the provisions of the Trust Agreement each and every sum of cash, and each and every security deposited in the Trust Fund, was security for all the outstanding Fifth Series Bonds, and the Bank had actual possession of and legal title thereto.

47. Under the terms of the Trust Agreement Fifth Series Bonds were issued and authenticated in denominations of $100, $500 and $1,000, so that various principal amounts thereof matured on the 1st day of each April and October, from October 1, 1926, to October 1, 1938, inclusive.

48. It was the intention of the parties that the Trust Fund was to consist of securities of the kind authorized for deposit under paragraphs (a), (b) or (c) of section 1 of article I of the Trust Agreement (hereinafter called "Mortgage Collateral"), computed at the unpaid principal amount, and cash or other securities of the kind authorized for deposit under paragraphs (d) or (e) of said section 1 of article I computed at their market value, sufficient in the aggregate to at least equal the aggregate principal amount of all Fifth Series Bonds outstanding.

49. It was the intention of the parties that the scheme of the Trust Agreement was to secure the Fifth Series Bonds by mortgage collateral which would become liquid within six months preceding, or three months after, the maturity date of any Fifth Series Bonds, which together with cash and securities of the kind authorized for deposit under paragraphs (d) or (e) of section 1 of article I would be sufficient in amount and timely as to payment to provide for the Fifth Series Bonds so maturing in accordance with their terms.

50. The Debtor had no resources with which to pay its obligations on its Fifth Series Bonds, except the income and principal payments on the securities in the Trust Fund.

51. It was the intention of the parties that the Debtor's obligations on its Fifth Series Bonds were to be paid out of the income from and the principal payments on the securities in the Trust Fund.

52. It was the intention of the parties that the Debtor's obligations on its bonds

would mature as to time and amount substantially contemporaneously with the time and amount of the principal payments on the securities in the Trust Fund.

53. It was the intention of the parties that the Bank should undertake to hold the Trust Fund in its possession, and as long as the aggregate principal amount of the Trust Fund was not less than the aggregate principal amount of the Fifth Series Bonds outstanding, and as long as no event of default existed upon which the Bank, as trustee, might take action, the Bank was to permit the Debtor or the Guarantor to service the bonds and mortgages and other securities constituting the Trust Fund, and to collect the principal and income thereon without expense to the Trust Fund, and to pay the same over to the Bank before the tenth day of the subsequent calendar month, or to pay over in lieu thereof eligible securities of equal aggregate principal amount or to deliver in lieu thereof an equal face principal amount of the Fifth Series Bonds maturing within six months after the date of such payment for cancellation.

54. It was the intention of the parties that the Debtor should have the right to substitute one eligible security for another, to withdraw bonds, mortgages, cash and other securities constituting the Trust Fund, and to otherwise deal with the Trust Fund.

55. It was the intention of the parties that the Debtor's right to substitute one eligible security for another, to withdraw bonds, mortgages, cash and other securities constituting the Trust Fund, and to otherwise deal with the Trust Fund, was limited.

56. It was the intention of the parties that the Bank should watch over the Trust Fund and to enforce the limitations upon the Debtor's right to substitute one eligible security for another, to withdraw bonds, mortgages, cash and other securities constituting the Trust Fund, and to otherwise deal with the Trust Fund.

57. It was the intention of the parties that the Bank should refuse permission to the Debtor for the withdrawal from the Trust Fund of any securities, including cash, if the Debtor was in default in the payment of principal due on any outstanding Fifth Series Bonds.

58. It was the intention of the parties that the Bank should refuse to permit the Debtor to withdraw from the Trust Fund any securities, including cash, either as excess collateral, on substitution of other collateral, or against the cancellation of Fifth Series Bonds, unless after the withdrawal there remained in the Trust Fund mortgage collateral computed at its then unpaid principal amount, which together with cash and securities of the kind authorized for deposit in the Trust Fund under paragraphs (d) and (e) of section 1 of article I of the Trust Agreement, computed at their then market value, would in the aggregate at least equal the aggregate principal amount of all Fifth Series Bonds then outstanding.

59. It was the intention of the parties that the Bank would refuse permission to the Debtor to withdraw from the Trust Fund any securities, including cash, either as excess collateral, on substitution of other collateral, or against the cancellation of Fifth Series Bonds, unless after the withdrawal the Trust Fund was in a liquid condition, that is to say, it contained mortgage collateral maturing within six months preceding, or three months after, the maturity date of any outstanding Fifth Series Bonds, which together with cash of the kind authorized for deposit in the Trust Fund under paragraphs (d) or (e) of section 1 of article I of the Trust Agreement would be sufficient in amount and timely as to payment to provide for the payment of Fifth Series Bonds so maturing in accordance with their terms.

60. It was the intention of the parties that if and so long as any mortgage collateral in the Trust Fund was in default in the payment of principal the Bank would refuse to permit the Debtor to withdraw from the Trust Fund any securities, including cash, either as excess collateral, on substitution of other collateral or against the cancellation of Fifth Series Bonds, except (a) the defaulted mortgage collateral upon the substitution therefor of other eligible collateral, and (b) any mortgage collateral in connection with its redemption or final payment at maturity upon the substitution therefor of the amount collected in payment or redemption of such matured or redeemed mortgage collateral.

61. It was the intention of the parties that the Bank at all times should prevent any unauthorized change, substitution or withdrawals of the bonds, mortgages, cash or other securities constituting the Trust Fund.

62. It was the intention of the parties that the Bank should have the right to con-

sult with any counsel of its own choosing about any matter pertaining to the Trust Fund and its rights, duties and obligations under the Trust Agreement, and that the Bank should exercise that right at the expense of the Debtor, and that until paid the Bank should have a lien therefor upon the Trust Fund prior to all Fifth Series Bonds.

63. It was the intention of the parties that a mortgage in default as to part of its prescribed principal payments was in default as to all thereof and that such a mortgage was not a maturing mortgage as to any prescribed principal payment, within the meaning of article I, section 6 of the Trust Agreement.

64. It was the intention of the parties that a default in the payment of a monthly deposit prescribed by any mortgage constituting part of the mortgage collateral was not a default in the payment of principal upon such mortgage, within the meaning of article I, section 6 of the Trust Agreement, until twenty days after such deposit became due, according to the terms of such mortgage.

65. On December 5, 1928, mortgage No. 5-736, for the principal sum of $275,000, a part of the Trust Fund, was returned to the Debtor.

66. At the time of its return, the sum of 275,000 cash was delivered to the Bank in substitution therefor.

67. On December 5, 1928, three mortgages, towit, mortgages Nos. 5-436, 5-460 and 5-559, were in default in the payment of principal; said mortgages were returned to the Debtor on August 16, 1930, December 31, 1928, and December 19, 1931, respectively.

68. On March 12, 1929, mortgage No. 5-565, in the principal sum of $29,000, a part of the Trust Fund, was returned to the Debtor.

69. At the time of its return, the sum of $29,000 cash was delivered to the Bank in substitution therefor.

70. On March 12, 1929, mortgages Nos. 436 and 559, were in default in the payment of principal.

71. On January 30, 1929, the balance of cash in the Trust Fund was the sum of $17,341.66.

72. On April 13, 1929, the balance of cash in the Trust Fund was the sum of $16,750.

73. On December 31, 1928, Mortgage No. 5-460, in the principal sum of $700,000, a part of the Trust Fund, was returned to the Debtor.

74. Mortgage No. 5-460 was so returned as excess collateral.

75. On said December 31, 1928, mortgage No. 5-460 was past due.

76. On said December 31, 1928, mortgages Nos. 5-436, 5-559 and 5-646 were in default in the payment of principal.

77. On December 19, 1931, mortgage No. 5-559, in the principal sum of $115,600, a part of the Trust Fund, was returned to the Debtor.

78. On said December 19, 1931, mortgage No. 5-559, was past due.

79. On said December 19, 1931, mortgages Nos. 5-449, 5-644, 5-646 and 5-778 were in default in the payment of principal.

80. The mortgages aforesaid were not returned to the Debtor for the purpose of redemption or final payment at maturity.

81. On said December 19, 1931, mortgage No. 5-449 was under foreclosure, the summons having been served on December 16, 1931, and lis pendens filed on December 30, 1931.

82. Said foreclosure action was brought by the Guarantor as agent for the Bank.

83. From April 28, 1926, to March 30, 1932, Raymond E. Jones was vice president of the Bank and a director of the Guarantor.

84. In said foreclosure action the affidavit of service of the summons and complaint was verified January 4, 1932, and filed in the County Clerk's Office February 24, 1932.

85. The said mortgages Nos. 5-736, 5-460, 5-565 and 5-559 were returned to the Debtor at its request, the requests being made in letter writings as to all thereof, except bond and mortgage No. 5-736; the Bank gave the requests due consideration and in returning said mortgages acted with deliberation.

86. Between October 14, 1926, and January 13, 1933, inclusive, $3,090,366.89 cash was returned by the Bank to the Debtor at its request in writing, of which $2,784,393.53 was returned as excess collateral, and $305,973.36 was returned in exchange for bonds delivered to the Bank by the Debtor for cancellation.

87. The items of cash so returned to the Debtor, and the dates upon which each thereof was returned respectively, are as follows:

| Date | Amount |
| --- | --- |
| October 14, 1926 | $ 41,700.00 |
| November 22, 1926 | 66,083.33 |
| February 11, 1927 | 2,516.67 |
| April 26, 1927 | 21,566.65 |
| May 13, 1927 | 55,008.35 |
| August 13, 1927 | 600.00 |
| October 17, 1927 | 45,790.00 |
| November 15, 1927 | 71,993.33 |
| November 23, 1927 | 4,000.00 |
| January 17, 1928 | 1,091.67 |
| March 5, 1928 | 2,400.00 |
| March 7, 1928 | 6,000.00 |
| April 26, 1928 | 10,800.00 |
| May 24, 1928 | 58,566.66 |
| June 18, 1928 | 5,000.00 |
| June 26, 1928 | 4,366.66 |
| August 11, 1928 | 4,831.66 |
| August 29, 1928 | 6,766.66 |
| September 21, 1928 | 4,876.66 |
| November 21, 1928 | 33,550.03 |
| December 1, 1928 | 2,400.00 |
| December 7, 1928 | 86,700.00 |
| December 13, 1928 | 3,241.67 |
| December 27, 1928 | 12,200.00 |
| January 30, 1929 | 202,550.00 |
| February 18, 1929 | 2,675.00 |
| February 25, 1929 | 300.00 |
| March 1, 1929 | 4,500.00 |
| March 16, 1929 | 2,400.00 |
| March 23, 1929 | 3,000.00 |
| March 25, 1929 | 32,700.00 |
| April 13, 1929 | 1,175.00 |
| May 13, 1929 | 59,525.00 |
| May 16, 1929 | 3,600.00 |
| June 14, 1929 | 100.00 |
| June 17, 1929 | 5,375.00 |
| June 21, 1929 | 4,000.00 |
| August 12, 1929 | 45,605.23 |
| August 13, 1929 | 2,400.00 |
| September 24, 1929 | 6,300.00 |
| October 5, 1929 | 10,000.00 |
| November 27, 1929 | 82,208.32 |
| December 19, 1929 | 7,800.00 |
| December 24, 1929 | 6,500.00 |
| January 23, 1930 | 2,500.00 |
| February 19, 1930 | 4,000.00 |
| February 28, 1930 | 11,500.00 |
| March 27, 1930 | 4,866.68 |
| April 18, 1930 | 7,450.00 |
| April 30, 1930 | 11,900.00 |
| May 21, 1930 | 54,000.00 |
| May 22, 1930 | 4,050.00 |
| June 6, 1930 | 8,033.33 |
| June 20, 1930 | 6,883.33 |
| July 2, 1930 | 100.00 |
| July 28, 1930 | 8,415.00 |
| October 14, 1930 | 486,150.00 |
| October 30, 1930 | 3,475.00 |
| October 31, 1930 | 19,800.00 |
| November 28, 1930 | 75,025.00 |
| December 22, 1930 | 2,750.00 |
| December 23, 1930 | 5,675.00 |
| December 24, 1930 | 2,900.00 |
| January 27, 1931 | 8,715.00 |
| January 30, 1931 | 300.00 |
| March 24, 1931 | 100.00 |
| March 27, 1931 | 100.00 |
| April 28, 1931 | 294,300.00 |
| June 6, 1931 | 82,650.00 |
| July 20, 1931 | 7,415.00 |
| July 24, 1931 | 300.00 |
| July 30, 1931 | 1,000.00 |
| August 17, 1931 | 6,750.00 |
| September 22, 1931 | 6,550.00 |
| September 30, 1931 | 42,500.00 |
| October 3, 1931 | 258,400.00 |
| October 5, 1931 | 142,100.00 |
| October 7, 1931 | 105,800.00 |
| October 16, 1931 | 41,750.00 |
| October 20, 1931 | 70,800.00 |
| October 24, 1931 | 37,600.00 |
| November 13, 1931 | 50,000.00 |
| November 17, 1931 | 73,675.00 |
| November 30, 1931 | 100.00 |
| November 30, 1931 | 2,100.00 |
| December 22, 1931 | 10,850.00 |
| February 3, 1932 | 7,200.00 |
| February 6, 1932 | 1,700.00 |
| February 6, 1932 | 1,000.00 |
| February 27, 1932 | 100.00 |
| March 16, 1932 | 1,200.00 |
| March 24, 1932 | 200.00 |
| April 8, 1932 | 50.00 |
| April 9, 1932 | 2,000.00 |
| April 18, 1932 | 5,200.00 |
| May 4, 1932 | 6,300.00 |
| May 12, 1932 | 6,500.00 |
| May 25, 1932 | 3,200.00 |
| June 6, 1932 | 5,000.00 |
| June 8, 1932 | 100.00 |
| June 9, 1932 | 15,500.00 |
| June 23, 1932 | 700.00 |
| June 25, 1932 | 50.00 |
| July 25, 1932 | 4,500.00 |
| August 3, 1932 | 500.00 |
| August 31, 1932 | 4,100.00 |
| September 27, 1932 | 800.00 |
| October 27, 1932 | 15,325.00 |
| October 29, 1932 | 3,000.00 |
| November 7, 1932 | 4,000.00 |
| November 18, 1932 | 2,000.00 |
| December 7, 1932 | 50.00 |
| December 10, 1932 | 1,000.00 |
| January 13, 1933 | 1,000.00 |

88. The said items of cash were returned to the Debtor at its request in letter writings, which writings characterized the withdrawal as excess cash or cash requested in exchange for bonds to be cancelled, except the items of cash returned on November 22, 1926, April 26, May 13, August 13 and November 15, 1927, January 17, March 5, May 24, August 29, September 21, December 7 and December 13, 1928, January 30, February 18, March 16, March 25, May 13, June 17, August 12, August 13, September 24, October 5, November 27, December 19, 1929, January 23, April 18, May 21, May 22, June 20, July 28, October 14, October 30, October 31, November 28, December 22, December 23 and December 24, 1930, as to which no letter writings can now be found, but the said items are accounted for by the Bank as items returned as excess.

89. From and after June 30, 1931, mortgages constituting part of the collateral were, and continued to be, in default in the payment of principal.

90. The cash returned to the Debtor after June 30, 1931, as aforesaid, aggregated $949,965, of which $864,140 was returned as excess collateral, and the balance of $85,825 was returned in exchange for bonds delivered to the Bank for cancellation.

91. Before June 30, 1931, mortgages constituting part of the Trust Fund were in default in payment of principal as follows:

| Date of Return | Description of Securities in default in payment of principal | Principal Amount |
|---|---|---|
| October 14, 1926 | B&M 5-535 | $ 350,000.00 |
| | 5-559 | 160,000.00 |
| | | $ 510,000.00 |
| November 22, 1926 | 5-559 | $ 160,000.00 |
| February 11, 1927 | 5-559 | $ 158,700.01 |
| April 26, 1927 | 5-436 | $ 65,000.00 |
| | 5-559 | 157,400.00 |
| | | $ 222,400.00 |
| May 13, 1927 | 5-436 | $ 65,000.00 |
| | 5-460 | 725,000.00 |
| | 5-559 | 157,400.00 |
| | | $ 947,400.00 |
| August 13, 1927 | 5-436 | $ 62,533.36 |
| | 5-460 | 715,000.00 |
| | 5-559 | 157,400.00 |
| | | $ 934,933.36 |
| October 17, 1927 | 5-559 | $ 157,400.00 |
| November 15, 1927 | 5-559 | $ 157,400.00 |
| November 23, 1927 | 5-559 | $ 157,400.00 |
| January 17, 1928 | 5-436 | $ 59,400.01 |
| | 5-559 | 157,400.00 |
| | | $ 216,800.01 |
| March 5, 1928 | 5-436 | $ 58,133.35 |
| | 5-559 | 157,400.00 |
| | | $ 215,533.35 |
| March 7, 1928 | 5-436 | $ 58,133.35 |
| | 5-559 | 157,400.00 |
| | | $ 215,533.35 |

| | | | |
|---|---|---|---|
| April | 26, 1928 | 5-559 | $ 157,400.00 |
| May | 24, 1928 | 5-460 | $ 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 857,400.00 |
| June | 18, 1928 | 5-460 | $ 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 857,400.00 |
| June | 26, 1928 | 5-460 | $ 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 857,400.00 |
| August | 11, 1928 | 5-460 | $ 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | 5-644 | 49,980.00 |
| | | | $ 907,380.00 |
| August | 29, 1928 | 5-460 | $ 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 857,400.00 |
| September | 21, 1928 | 5-436 | $ 54,416.70 |
| | | 5-460 | 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 911,816.70 |
| November | 21, 1928 | 5-436 | $ 53,166.67 |
| | | 5-460 | 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 910,566.67 |
| December | 1, 1928 | 5-436 | $ 53,166.67 |
| | | 5-460 | 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 910,566.67 |
| December | 7, 1928 | 5-436 | $ 53,166.67 |
| | | 5-460 | 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 910,566.67 |
| December | 13, 1928 | 5-436 | $ 53,166.67 |
| | | 5-460 | 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | | $ 910,566.67 |
| December | 27, 1928 | 5-436 | $ 52,533.34 |
| | | 5-460 | 700,000.00 |
| | | 5-559 | 157,400.00 |
| | | 5-646 | 29,605.00 |
| | | | $ 939,538.34 |

| | | | |
|---|---|---|---|
| January 30, 1929 | | 5-436 | $ 52,533.34 |
| | | 5-559 | 157,400.00 |
| | | | $ 209,933.34 |
| February 18, 1929 | | 5-436 | $ 52,533.34 |
| | | 5-559 | 157,400.00 |
| | | | $ 209,933.34 |
| February 25, 1929 | | 5-436 | $ 52,533.34 |
| | | 5-559 | 157,400.00 |
| | | | $ 209,933.34 |
| March 1, 1929 | | 5-436 | $ 52,533.34 |
| | | 5-559 | 157,400.00 |
| | | | $ 209,933.34 |
| March 16, 1929 | | 5-436 | $ 51,900.01 |
| | | 5-559 | 157,400.00 |
| | | | $ 209,300.01 |
| March 23, 1929 | | 5-436 | $ 51,900.01 |
| | | 5-559 | 157,400.00 |
| | | | $ 209,300.01 |
| March 25, 1929 | | 5-436 | $ 51,900.01 |
| | | 5-559 | 157,400.00 |
| | | | $ 209,300.01 |
| April 13, 1929 | | 5-436 | $ 50,000.00 |
| | | 5-501 | 273,000.00 |
| | | 5-559 | 157,400.00 |
| | | 5-795 | 175,000.00 |
| | | | $ 655,400.00 |
| May 13, 1929 | | 5-436 | $ 49,383.34 |
| | | 5-559 | 157,400.00 |
| | | 5-795 | 175,000.00 |
| | | | $ 381,783.34 |
| May 16, 1929 | | 5-436 | $ 49,383.34 |
| | | 5-559 | 157,400.00 |
| | | 5-795 | 175,000.00 |
| | | | $ 381,783.34 |
| June 14, 1929 | | 5-436 | $ 48,766.68 |
| | | 5-559 | 157,400.00 |
| | | | $ 206,166.68 |
| June 17, 1929 | | 5-436 | $ 48,766.68 |
| | | 5-559 | 157,400.00 |
| | | | $ 206,166.68 |

| | | | |
|---|---|---|---:|
| June | 21, 1929 | 5-436 | $ 48,766.68 |
| | | 5-559 | 157,400.00 |
| | | | $ 206,166.68 |
| August | 12, 1929 | 5-436 | $ 48,766.68 |
| | | 5-462 | 57,000.00 |
| | | 5-644 | 48,960.00 |
| | | | $ 154,726.68 |
| August | 13, 1929 | 5-436 | $ 48,766.68 |
| | | 5-462 | 57,000.00 |
| | | 5-644 | 48,960.00 |
| | | | $ 154,726.68 |
| September | 24, 1929 | 5-436 | $ 48,766.68 |
| October | 5, 1929 | 5-431 | $ 104,000.00 |
| | | 5-436 | 48,766.68 |
| | | 5-449 | 390,000.00 |
| | | 5-561 | 62,400.00 |
| | | 5-795 | 173,000.00 |
| | | 5-853 | 272,250.00 |
| | | | $1,050,416.68 |
| November | 27, 1929 | 5-436 | $ 48,766.68 |
| | | 5-778 | 237,500.00 |
| | | | $ 286,266.68 |
| December | 19, 1929 | 5-436 | $ 48,766.68 |
| | | 5-646 | 28,675.00 |
| | | | $ 77,441.68 |
| December | 24, 1929 | 5-436 | $ 48,766.68 |
| | | 5-646 | 28,675.00 |
| | | | $ 77,441.68 |
| January | 23, 1930 | 5-436 | $ 48,766.68 |
| | | 5-666 | 150,400.00 |
| | | | $ 199,166.68 |
| February | 19, 1930 | 5-436 | $ 46,300.00 |
| February | 28, 1930 | 5-436 | $ 46,300.00 |
| March | 27, 1930 | 5-436 | $ 42,109.16 |
| April | 18, 1930 | 5-431 | $ 100,800.00 |
| | | 5-436 | 41,866.67 |
| | | | $ 142,666.67 |
| April | 30, 1930 | 5-431 | $ 100,800.00 |
| | | 5-436 | 41,866.67 |
| | | | $ 142,666.67 |
| May | 21, 1930 | 5-431 | $ 100,800.00 |
| | | 5-436 | 41,233.34 |
| | | | $ 142,033.34 |

| | | | |
|---|---|---|---|
| May | 22, 1930 | 5-431 | $ 100,800.00 |
| | | 5-436 | 41,233.34 |
| | | | $ 142,033.34 |
| June | 6, 1930 | 5-431 | $ 99,000.00 |
| | | 5-436 | 41,233.34 |
| | | | $ 140,233.34 |
| June | 20, 1930 | 5-436 | $ 41,233.34 |
| July | 2, 1930 | 5-436 | $ 41,233.34 |
| | | 5-462 | 49,000.00 |
| | | 5-666 | 148,000.00 |
| | | | $ 238,233.34 |
| July | 28, 1930 | 5-436 | $ 41,233.34 |
| | | 5-666 | 148,000.00 |
| | | | $ 189,233.34 |
| October | 14, 1930 | 5-853 | $ 266,750.00 |
| October | 30, 1930 | 5-853 | $ 266,750.00 |
| October | 31, 1930 | 5-853 | $ 266,750.00 |
| November | 28, 1930 | 5-778 | $ 232,475.00 |
| December | 22, 1930 | 5-646 | $ 27,745.00 |
| | | 5-778 | 232,475.00 |
| | | | $ 260,220.00 |
| December | 23, 1930 | 5-778 | $ 232,475.00 |
| December | 24, 1930 | 5-778 | $ 232,475.00 |
| January | 27, 1931 | 5-666 | $ 145,600.00 |
| January | 30, 1931 | 5-666 | $ 145,600.00 |
| March | 24, 1931 | 5-5555 | $ 2,750.00 |
| March | 27, 1931 | 5-5555 | $ 2,750.00 |
| April | 28, 1931 | 5-449 | $ 366,800.00 |
| | | 5-853 | 264,000.00 |
| | | | $ 630,800.00 |
| June | 6, 1931 | 5-778 | $ 230,000.00 |

92. On the dates aforesaid the Bank knew that all of the aforesaid mortgage collateral was in default in the payment of principal.

93. On August 19, September 24, September 26, September 29, 1930, February 27, March 14, June 17, June 27, and June 30, 1931, there were no defaults in the payment of principal upon any of the mortgage collateral constituting the Trust Fund, and the Trust Fund was at par and in liquid condition in accordance with the intention of the parties.

94. In returning to the Debtor the cash aforesaid the Bank gave the requests of the Debtor due consideration and acted with deliberation.

95. The Bank and the Debtor made monthly comparisons of their respective records, and each month an account was stated between the Bank and the Debtor showing the collateral in the Trust Fund, the Fifth Series Bonds authenticated, the maturities of the bonds so authenticated, the maturities of the principal payments on the mortgage collateral matched against

said bond maturities, the cash and miscellaneous collateral in the Trust Fund, and a balance was struck.

96. Before January 1, 1932, the Bank and the Debtor in stating accounts and in striking a balance as aforesaid deducted the amount of past due mortgage collateral; after January 1, 1932, past due mortgage collateral was not deducted.

97. On April 1, 1932, the Debtor defaulted in the payment of the principal on Fifth Series Bonds maturing on that date.

98. On August 31, 1943, $1,783,980 was still due and owing to the public holders of Modified Fifth Series Bonds; interest at 5½% per annum had been paid to May 3, 1936.

99. It was the intention of the parties that the Debtor should deposit with the Bank a guaranty of the Guarantor, guaranteeing payment of interest semiannually when due, and of principal within 18 months after the same became due, according to the terms of each bond, mortgage and other security in the Trust Fund, under paragraphs (a), (b) and (c), section 1, article I of the Trust Agreement, and the Debtor covenanted to do so.

100. The Debtor defaulted in the performance of this covenant.

101. The Bank made no demand and took no action to enforce the performance by the Debtor of its said covenant; no request was made by bondholders that the Bank take such action; and no indemnity for such action was tendered to it.

102. The bondholders did not know, and were not informed by the Bank, that the Debtor had defaulted in the performance of said covenant.

103. At divers times mortgage collateral was in default in the payment of principal for 18 months or more, of which the Bank had knowledge.

104. On February 1, 1935, when the Guarantor filed its petition for reorganization under Section 77B of the Bankruptcy Act, mortgage collateral was in default in the payment of principal for 18 months.

105. In the Guarantor's reorganization proceedings the successor corporation to the Guarantor was authorized and directed as of December 30, 1939, to pay an initial dividend of eight-tenths of one per cent on account of claims filed in said proceedings, pursuant to the Plan of Reorganization duly confirmed therein.

106. The amount of claims allowed in that proceeding as of May 26, 1939, was $133,769,323.18, including the claim of the Reconstruction Finance Corporation, amounting to $11,347,775.50.

107. The amount of cash on hand as of the effective date of the initial distribution to the creditors of the Guarantor was $1,477,743.29, of which $979,372.38 was distributed, leaving $498,370.91 undistributed.

108. In January, 1942, there was distributed a second dividend of one per cent. to claimants of record on December 31, 1941, amounting to $71,333,250.48, which sum was arrived at by deducting from the aggregate amount of original claims the appraised value of the collateral in the Guarantor's proceeding.

109. The cash available for such second distribution was the sum of $874,405.80.

110. After paying the said second dividend there remained on hand in the Guarantor's reorganization proceedings the sum of $161,073.26.

111. In the Guarantor's reorganization proceedings claims on the guaranty of the Fifth Series Bonds were duly allowed to the total amount of bonds outstanding with accrued interest to February 1, 1935, excluding bonds held by the Guarantor.

112. Between June 5, 1924, and July 18, 1933, the Guarantor was from time to time indebted to the Bank in its individual capacity for money loaned.

113. On July 30, 1931, the Bank, in such capacity, loaned the Guarantor $2,000,000 which on November 30, 1931, was reduced by payment to $1,000,000 and the latter amount was collateralized by the deposit with the Bank of bonds and mortgages and certificates of deposit. On July 18, 1933, the balance of said loan, then amounting to $1,000,000, was liquidated by acceptance by the Bank of title to the securities then on deposit as collateral to said loan.

114. The Bank did not realize any profit, nor make any gain whatsoever, from the acts complained of in the objections, or any of them.

115. The Bank was guilty of no fraud in committing the acts complained of in the said objections, or any of them.

116. No part of the Trust Fund, at any time in its possession, is now in possession of the Bank.

117. No part of the collateral returned to the Debtor by the Bank was so returned

with the intention on the part of the Bank of circumventing any of the provisions of the Trust Agreement.

118. It was the intention of the parties that the Bank should be under no obligation to take any action to enforce any of the provisions contained in any of the securities deposited in the Trust Fund, or toward the execution or enforcement of the Trust which, in its opinion should be likely to involve it in expense or liability, unless the Debtor, or one or more of the bondholders, should furnish as often as required by the Bank, indemnity satisfactory to it.

## Conclusions of Law.

1. The Bank is entitled to a decree settling its account filed herein on the 8th day of September, 1938, as amended at the trial, and to be discharged from all matters embraced in the said account and the said schedules annexed thereto, as so amended, except

(a) The Bank is not entitled to credit in amended schedule "B" of its said account for $115,600, being the principal amount of Mortgage No. 5-559, returned to the Debtor on December 19, 1931;

(b) The Bank is not entitled to credit for the items in amended schedule "E" of its said account, aggregating $864,140, for cash returned to the Debtor as excess collateral, on the dates and in the amounts following:

| Date | | Amount |
|---|---|---|
| July | 20, 1931 | $ 7,415.00 |
| July | 24, 1931 | 300.00 |
| July | 30, 1931 | 1,000.00 |
| August | 17, 1931 | 6,750.00 |
| September | 22, 1931 | 6,550.00 |
| September | 30, 1931 | 42,500.00 |
| October | 3, 1931 | 258,400.00 |
| October | 5, 1931 | 142,100.00 |
| October | 7, 1931 | 105,800.00 |
| October | 16, 1931 | 41,750.00 |
| October | 20, 1931 | 70,800.00 |
| October | 24, 1931 | 37,600.00 |
| November | 13, 1931 | 50,000.00 |
| November | 17, 1931 | 73,675.00 |
| November | 30, 1931 | 100.00 |
| November | 30, 1931 | 2,100.00 |
| December | 22, 1931 | 10,850.00 |
| April | 8, 1932 | 50.00 |
| May | 4, 1932 | 6,300.00 |
| June | 25, 1932 | 50.00 |
| December | 7, 1932 | 50.00 |
| | | $864,140.00 |

(c) The Bank is not entitled to credit for the items in amended schedule "E" of its said account aggregating $85,825, for cash returned to the Debtor in exchange for bonds delivered to it for cancellation, on the dates and in the amounts following:

| Date | | Amount |
|---|---|---|
| February | 3, 1932 | $ 7,200.00 |
| February | 6, 1932 | 1,700.00 |
| February | 6, 1932 | 1,000.00 |
| February | 27, 1932 | 100.00 |
| March | 16, 1932 | 1,200.00 |
| March | 24, 1932 | 200.00 |
| April | 9, 1932 | 2,000.00 |
| April | 18, 1932 | 5,200.00 |
| May | 12, 1932 | 6,500.00 |
| May | 25, 1932 | 3,200.00 |
| June | 6, 1932 | 5,000.00 |
| June | 8, 1932 | 100.00 |
| June | 9, 1932 | 15,500.00 |
| June | 23, 1932 | 700.00 |
| July | 25, 1932 | 4,500.00 |
| August | 3, 1932 | 500.00 |
| August | 31, 1932 | 4,100.00 |
| September | 27, 1932 | 800.00 |
| October | 27, 1932 | 15,325.00 |
| October | 29, 1932 | 3,000.00 |
| November | 7, 1932 | 4,000.00 |
| November | 18, 1932 | 2,000.00 |
| December | 10, 1932 | 1,000.00 |
| January | 13, 1933 | 1,000.00 |
| | | $85,825.00 |

2. The Objectors are entitled to a decree surcharging the Bank with the aggregate of the amounts aforesaid, to wit, the sum of $1,065,565, and to have judgment therefor with taxable costs.

3. Upon paying the judgment aforesaid to the New Company to be held by it subject to the order of the Court, the Bank is entitled to a lien in the sum of $85,825 upon the trust fund in possession of City Bank Farmers Trust Company, as successor trustee, under Supplemental trust indenture between Prudence Bonds Corporation (New Corporation) and City Bank Farmers Trust Company as trustee, dated as of March 1, 1938, which lien will be subordinate to the lien of the public holders of the Modified Fifth Series Bonds and in parity with the lien of the holders of the subordinated Fifth Series Bonds.

4. The Bank's defense that the objections are barred by the Statute of Limitations of the State of New York should be dismissed.

5. The Bank's defense that the New Company and the Reorganization Trustees are not the proper parties in interest should be dismissed.

6. The Bank's motions to dismiss the third, fourth and fifth objections should be granted, and the said objections dismissed.

To the Honorable Judges of the United States District Court for the Eastern District of New York:

By an order of this Court, dated February 26, 1940, there were referred to me as Special Master the issues raised by the account and petition of the President and Directors of the Manhattan Company, as trustee under Trust Agreement dated March 1, 1927, securing Prudence Bonds, Series Ninth (hereinafter referred to as the "Bank"), and the objections filed thereto by Charles H. Kelby and Clifford S. Kelsey, trustees in Reorganization of the Debtor in this proceeding (hereinafter called the "Reorganization Trustees") and by Prudence Bonds Corporation, the new corporation formed pursuant to the Plans of Reorganization confirmed in this proceeding (hereinafter called the "New Company"), and by George E. Eddy, Sarah and Leopold Helfant and Samuel Plasser, bondholders. The order of reference directed me to take testimony and to hear and report on the facts and the law, with my recommendation and opinion thereon, in accordance with the usual practice of this Court.

All notices required by the order of reference were duly given and published in accordance with said order, and hearings were duly held in accordance with said notices and as directed by said order.

The issues were duly tried and the hearings duly closed, and upon all the papers and proceedings had herein, and the evidence taken at such hearings, I beg leave to report as follows:

### Historical Background

[Same as stated with reference to Prudence Bonds, Series Fifth.]

### The Account

[Same as stated with reference to Prudence Bonds, Series Fifth.]

### The Objections

The objections which raised the issues tried in this proceeding were filed by the New Company, the Reorganization Trustees and the bondholders aforesaid. In legal effect, they are all the same, and as amended at the trial, may be summarized generally as follows:

(A) Amended objections numbered first and second ask disallowance of credits claimed by the Bank in schedules "B" and "E" of the account, respectively, for one mortgage in the principal sum of $95,000, and for $1,977,391.69 cash, returned by the Bank to the Debtor at its request. The Objectors charge that in returning such collateral to the Debtor the Bank transcended its powers under the trust indenture, and that in so doing it was grossly negligent and careless.

(B) Amended objection numbered third asks the disallowance of credit for $12,500 in schedule "A", for a mortgage in the sum of $12,500 turned over to the New Company. The mortgage, it is charged, was an ineligible security.

(C) Amended objection numbered fourth asks disallowance of credit for $5,300 in schedule "G" of the account for bonds of that amount which it cancelled in lieu of principal cash collected by the Debtor and retained by it.

(D) Amended objections numbered fifth and sixth object to the account generally, on the ground that the Bank failed to require the Debtor to fulfill its covenant to file with the Bank guarantees by the Guarantor of the underlying collateral, and that it authenticated bonds without first obtaining such guarantees. The Objectors charge by these objections that such guarantees were prescribed elements of the collateral, without which the trust should never have been initiated, the bonds should never have been authenticated and sold to the public, and the acts and proceedings accounted for should never have been transacted.

A. The first and second objections raise for initial consideration the questions: Did the Bank transcend its powers by returning said mortgage and cash to the Debtor, and was it grossly negligent and careless in so doing?

The trust indenture is multipartite; the Bank and the Debtor were signatories. Each bondholder became a party by the acceptance of his bonds, and became charged with knowledge of the terms of the indenture and entitled to its benefits. By the scheme of the indenture the Debtor conveyed to the Bank five different classes of collateral. Classes (a), (b) and (c) consisted of real estate securities, such as

mortgages, certificates of mortgages and the like; class (d) comprised investments, legal for savings banks in the State of New York; and class (e) cash, United States, state and municipal bonds. The sum of the securities of all such classes was always to be at least equal to the amount of the Ninth Series Bonds outstanding; the (d) and (e) securities to be valued at market; (a), (b) and (c) securities to be valued at face, whether or not any of them were overdue or in default in either interest or principal. All collateral, collectively known as the "Trust Fund," was to be held by the Bank for the equal and pro rata benefit and security of the Ninth Series Bondholders.

Until the occurrence of an event of default, as defined in the Trust Agreement, the Debtor enjoyed extraordinary liberties to deal with the underlying collateral. It had the right, among others, subject to the limitations hereinafter discussed, to substitute one security for another and, whenever the collateral valued as above described exceeded the aggregate principal amount of the bonds outstanding, to withdraw such excess. The applicable provisions of the Trust Agreement are as follows:

"Section 6. *Substitution and Withdrawal of Securities; Etc.*—Unless there shall exist an event of default under which the Trustee may take action as hereinafter provided, the Corporation may from time to time withdraw any bonds, mortgages or other securities or cash from the Trust Fund (1) by substituting therefor bonds, mortgages or other securities or cash authorized by Section 1 of this Article equal in amount or value as prescribed by Section 4 of this Article to the unpaid principal of the bonds, mortgages or other securities or cash withdrawn; (2) by written application of the Corporation to the Trustee for such withdrawal at any time the principal amount of the Trust Fund may exceed the par value of the Prudence-Bonds then issued and outstanding hereunder. The Trustee will accordingly deliver the bonds, mortgages or other securities or cash so withdrawn, with any necessary assignments thereof,

(First proviso)

"*provided there shall remain in the Trust Fund after any such withdrawal, bonds, mortgages or other securities deposited under paragraphs (a), (b) and (c), Section 1 of this Article, sufficient in principal amount maturing during the six months' period immediately preceding or the three months' period immediately following and including the maturity date of any Prudence-Bonds then issued and outstanding hereunder, when added to the value of securities and cash deposited under paragraphs (d) and (e), Section 1 of this Article (which are available for any period), to at least equal the principal amount of Prudence-Bonds then issued and outstanding hereunder maturing within such period,*

(Second proviso)

"*and further provided that if and as long as any securities deposited in the Trust Fund under paragraphs (a), (b) or (c), Section 1 of this Article, shall be in default in the payment of principal, the Corporation shall be permitted to withdraw only such securities deposited under said paragraphs (a), (b) or (c), as shall be in default (except in connection with the redemption or final payment at maturity of any other securities not in default deposited under such paragraphs).*

"Upon the delivery to the Trustee for cancellation of any or all of the Prudence-Bonds secured hereunder with all unmatured coupons attached thereto, or cash equal to such coupons as are not delivered (or in lieu of any thereof, a certificate by an officer of the Corporation, approved by an officer of The Prudence Company, Inc., that certain of such bonds, with the coupons, if any, belonging thereto, matured at a date in excess of six years prior to the date of said certificate and have not been presented for payment), and unless there shall exist an event of default under which the Trustee may take action as hereinafter provided, the Corporation shall be entitled to withdraw from the Trust Fund and receive from the Trustee, in accordance with the provisions of the preceding paragraph of this section, bonds, mortgages or other securities or cash equal in amount and value to the principal amount of the Prudence-Bonds so actually presented for cancellation or represented by such certificate." (Italics, paragraphing and numbering of italicized matter mine.)

These are the only provisions of the indenture which permitted collateral once received by the Bank to be returned to the Debtor.

Two definite conditions were imposed. The first, found in the first proviso (italicized above), was that the fund, after any such return of collateral, should remain

liquid and at par; that is to say, it should contain (a), (b) and (c) collateral matur ing within six months before, or three months after, the date when Ninth Series Bonds were destined by their terms to fall due, which, with the cash and (d) and (e) securities in the Trust Fund, should at least equal the principal amount of Prudence Bonds then issued and outstanding Fail ure of this condition required the entire fund to be frozen. The second condition, found in the second proviso (italicized above), was that no (a), (b) or (c) col lateral should be in default in the payment of principal. If any such collateral was in default, the Trust Fund was to be frozen except for the extraction, while maintaining both parity and liquidity, of the defaulted collateral. These are the conditions which the Objectors charge were violated; that is to say, it is claimed that the mortgage and cash described in the objections were returned to the Debtor, in violation of the first proviso, or at times when defaulted mortgages remained in the Trust Fund, in violation of the second.

The first proviso, which counsel have referred to for the sake of convenience as the "parity and liquidity proviso", required that collateral should become liquid sub stantially contemporaneously with the maturing of the bonds in an amount suf ficient to pay each maturity The inten tion was quite evidently that there should be in the Trust Fund enough collateral to pay the bonds, and that such collateral should mature in time to pay them; that is to say, the intake was intended to be timed and measured to match the outgo. Such was the scheme of the Trust, and it was calculated to work so long as the col lateral was in good standing, for the Debtor was without any other resources to meet its obligations. The scheme was expected to fail to work the moment a mortgage de faulted in any principal payment. Hence the second proviso, that the Trust Fund was not to be disturbed after such a de fault, except to extract the defaulted mort gage, upon substituting a good one, or other eligible collateral, if necessary to maintain parity and liquidity.

The Guarantor could not be expected to be of any help in paying the bonds at their several maturities, for its obligation was to make good the Debtor's principal defaults only after eighteen months.

Keeping the Trust Fund in parity and in liquid condition to meet the periodically maturing bonds was the plain duty of the Bank under the Trust Agreement. This the Bank disclaims, but it seems clear to me that the use of the word "permitted" in the second proviso is consistent only with the construction that it had the duty to give permission and to grant the Debtor's ap plications for the withdrawal or substitu tion of collateral only when a clear right existed In my opinion, the true intent and meaning of the trust indenture was that the Bank should watch over the Trust Fund, seal it against any unchartered in cursion by the Debtor, and keep it in con dition to meet the Debtor's obligations on its bonds.

If the bondholders read the indenture be fore they became parties to it, this is how it must have seemed to them; if they did not read it, which is not unlikely, they at least knew that they had the firm obliga tion of the Debtor to pay the principal sums of their bonds at maturity, and that the Bank held collateral to secure such pay ment.

Even without the liquidity clause, the scheme as a whole shows the intention to liquidate the bonds out of the collateral and to create real and not gossamered obliga tions for the Debtor.

This construction outlined above is sus tained by the conduct of the parties. It was the custom of the Debtor and the Bank to make monthly comparisons of their re spective records with respect to the parity and liquidity of the Trust Fund. Monthly the Debtor would write the Bank a letter like that of June 6, 1931, viz.:

"We enclose herewith, statements show ing total deposits, total authentications, and credit existing in the Fifth Series and Ninth Series Trust Funds as at May 31st, 1931.

"If these figures do not agree with your records we shall be pleased to have you ad vise us accordingly."

The enclosure referred to, known as a "reconciliation statement," would set forth the maturity dates of the outstanding bonds; the maturities of the mortgage collateral matched therewith; the past due collateral; the cash in the Trust Fund; and strike a balance.

The Bank would usually reply substan tially in the following form:

"This will advise you that we have re ceived your communication of June 6th, 1931 enclosing statements disclosing the

status of the 5th and 9th Series Trust Funds as at May 31, 1931.

"A comparison of these statements with our records reveals that they are in agreement."

On February 18, 1930 the Bank took issue with the Debtor, as indicated by the Bank's letter of February 18, 1930, reading in part as follows: " * * * With reference to the statement of the Ninth Series showing securities deposited, authentications and balances, we wish to point out that the security of $43,791.68 which should be shown against the maturity of March 1, 1930 is not shown on your statement and that the total of outstanding mortgages, plus the amount of miscellaneous cash, $31,-883.32, should total $4,933,700.00 and not $4,939,266.66 as your statement shows. Kindly forward us a corrected statement * * *."

The Bank prevailed and a corrected statement, conforming to the Bank's records, was sent to the Bank by the Debtor on March 6, 1930.

After June 8, 1931, the record does not disclose any account affirmatively stated, neither does it show any dispute.

With the records thus reconciled monthly, it was customary for the Debtor to write to the Bank substantially in the form of its letter of March 13, 1931, reading as follows:

"We have, at present, on deposit in the Trust Fund created by the above Trust Agreement $247,325 in cash against which Prudence Bonds have been authenticated.

"We hereby request the withdrawal of this sum and ask that you send a check for this amount to our Brooklyn office."

The Bank would usually comply by sending the Debtor the cash or security requested. In answer to the letter just quoted it sent check for $247,300 or $25 less than requested. The Bank explained the difference in its letter of March 14, 1931, as follows: " * * * You will notice that our payment out of the 9th Series Trust Fund is for $25.00 less than the amount you requested and this is due to loss of collateral in connection with Modification Agreement dated February 21, 1931 which you forwarded to us by your letter dated March 11th, at which time you forwarded us your check for $250.00 to take up this loss of collateral. However, the loss of collateral to be adjusted, according to our records, is $275.00 * * *."

In this instance the Bank exercised its power of supervision, scaled down the Debtor's request, and "permitted" less than the amount requested to be withdrawn.

On July 6, 1928, mortgage No. 737 in the principal sum of $95,000 was returned to the Debtor upon a like written request. This mortgage was not in default in the payment of principal and was not withdrawn from the Trust Fund in connection with its redemption or final payment at maturity. On or about June 23, 1928, the Realty Associates and the Guarantor entered into an ownership agreement relating to this mortgage, under which it was declared that the interest of the Guarantor in said bond and mortgage was a senior share to the extent of the principal sum of $85,-000, and that the interest of Realty Associates was a junior and subordinate share to the extent of $10,000. On July 21, 1928, the said mortgage was redeposited in the Trust Fund, subject to the provisions of the said ownership agreement. On September 9, 1932, the said mortgage in the then principal sum of $72,916.70 was returned to the Debtor by the Bank in exchange for $72,916.70 cash.

The dealings between the Bank and the Debtor were such that the Trust Fund was periodically restored to its lawful state; a sufficient amount of eligible and liquid securities matched the outstanding Prudence bonds. This periodic restoration was short-lived, but while it lasted was complete and legally accomplished. The last of such restoration dates was September 1, 1931. On that date, as the Bank's counsel puts it, the Trust Fund was "sweet." It was in the condition, both as to parity and liquidity, which the bondholders bargained for. Whether the return of this mortgage on July 6, 1928, was authorized or not, it is my opinion that by the subsequent restoration of the Trust Fund to legal status, no ascertainable diminution of the Trust Fund resulted. Accordingly, it is my opinion that the first objection should be dismissed.

Between March 5, 1928, and January 13, 1933, inclusive, $1,977,391.69 in cash was also returned by the Bank to the Debtor at the latter's request. Of this sum $1,853,-608.41 was returned as excess and $123,-783.28 was returned in exchange for bonds, which were cancelled.

As above stated, the Trust Fund was in balance for the last time on September 1, 1931. All the disputed items of cash re-

turned to the Debtor before that date, whether or not authorized by the terms of the indenture, resulted in no ascertainable diminution of the trust fund. I recommend that the objection as to all credit items claimed by the Bank for cash returned to the Debtor before September 1, 1931, be dismissed, and that all such credit items be allowed.

After September 1, 1931, cash returned to the Debtor aggregated $135,699.-99. On the dates of the withdrawal of each item of cash constituting that sum, mortgages in the Trust Fund were in default in the payment of principal. The Trust Fund after September 1, 1931, to adapt counsel's metaphor, was "sour." Of this cash, $47,-575.01 was returned as excess and $88,124.-98 was returned against bonds surrendered for cancellation. $90,166.66 was returned after March 1, 1932, the date when the Debtor defaulted in the payment of principal on its Ninth Series Bonds.

The Bank argues that there was no prohibition against the withdrawal of cash. As I have said before, the practical operation of the scheme of the trust was that parity and liquidity should at all times be maintained. The scheme could not possibly work if the liquid collateral was extracted while law suits on defaulted mortgages remained. The indenture (art. I, sec. 6) is very definite; the Debtor was permitted to withdraw "only such securities deposited under said paragraphs (a), (b) or (c) as shall be in default * * *"

The scheme as it was operated did not work, for on March 1, 1932, the Debtor defaulted in the payment of principal on the Ninth Series Bonds. As late as last year, the sum of $1,970,370 was still due the public holders of Ninth Series Bonds.

On January 2, 1932 the Guarantor announced the Debtor's proposed default, and bonds thereafter presented for payment at maturity were returned, with a notice to bondholders, of which the Bank had knowledge, that currently maturing bonds would not be paid until eighteen months later. It reads as follows:

"Believing it to be to the best interest of all concerned, this bond will not be paid at the present time. The bond is secured by first mortgages and owners are encountering great difficulty in collecting rents and making principal payments.

"Foreclosure, while in some cases necessary, should not be resorted to indiscriminately. Expert study of each situation and a period of waiting for a clarification of the financial situation are necessary. It is in anticipation of periods such as this that a conservative guarantor of mortgage investments reserves a period of eighteen months after the due date in which to collect the principal.

"Under the terms of our guaranty interest is to be paid at the rate guaranteed on each interest date. To avail yourself of this right, you may present this bond at any of our offices on each interest date for the payment of six months' interest at the rate guaranteed and the payment when made will be endorsed on the bond.

"If you desire, you can deposit the bond with us and we will issue a transferable receipt, holding the bond for your account. If the bond is deposited with us, the payment of interest will be effected by check mailed to you.

"In any event, it is desirable that you furnish us with your name and the address to which mail concerning this bond may be sent so that you may be promptly notified when payment will be made.

"The Prudence Company, Inc."

The Bank argues that the Debtor and the Guarantor could not be expected to use their cash resources to stem the tide. If the scheme of the trust was as I have stated it to be, the Bank had no right to permit the bondholders' cash to be used for that or any other purpose, except to keep the Trust Fund liquid. In short, the Bank should not have permitted the withdrawals. There was no excess cash.

After January 1, 1932, instead of refusing the Debtor's application for the withdrawal of cash, the Bank seems to have made it easier. Before that date it was the practice in reconciling their accounts and striking a balance, to deduct past-due mortgage collateral. On that day this procedure was changed; no deduction for past-due collateral was thereafter made. Such collateral was included in the Trust Fund as if it were a maturing asset and the fiction of excess cash was continued. Even after the bonds defaulted, over $1,800 of so-called excess cash was returned to the Debtor.

The Bank argues that no damage resulted to the Trust Fund even after September 1, 1931. In fact, it makes the claim that the Trust Fund benefited by the evisceration. It arrives at this conclusion by attempting

to show that the present-day values of the residue of real estate covered by the defaulted mortgages, together with the principal cash received by the New Company from said mortgages, aggregate more than the so-called excess extracted after September 1, 1931. But the answer is plain. Since there was no excess collateral, neither the cash nor the mortgages could have been extracted legally; both should have remained in the Trust Fund. And even if both had been permitted to remain, it is very doubtful that the Trust Fund would thereby have been rendered solvent. [See reports of August 1, 1936, and March 11, 1937.] Besides, the present-day values of the properties reflect an additional investment of servicing costs and skill by the New Company. Accordingly, the proffered evidence of present-day values was excluded.

■ The sum of $88,124.98 was returned to the Debtor in exchange for bonds which were cancelled. Such a transaction, by the terms of the indenture, was required to be "in accordance with the provisions of the preceding paragraph of this section * * *" (sec. 6, art. I above quoted). With the Trust Fund out of balance as to parity and liquidity the Debtor was not entitled to surrender bonds for cash. The bonds thus surrendered must be considered an investment of the Bank's own funds.

Accordingly I recommend that the motions to dismiss the second objection as to the $135,699.99 of cash withdrawn after September 1, 1931, be denied, that the objection as to such items be sustained, and that the credit items claimed by the Bank for the cash so returned be disallowed.

Upon restoration of the sum aforesaid, the Bank will be entitled to a lien for $88,-124.98 upon the Trust Fund subordinate to the publicly held bonds and in parity with the subordinated bonds.

■ No finding of negligence on the part of the Bank will be made; no bad faith will be found. The Bank exceeded its powers in returning the collateral in question, and in so doing acted deliberately. It is a matter of no consequence whether it did so carelessly or painstakingly.

■ B. The third objection relates to mortgage No. 8934 for $12,500, received by the Bank on October 31, 1932. On October 31, 1932, the Debtor collected $12,500 principal on one of the mortgages in the Trust Fund. Instead of turning that principal

collection over to the Bank it delivered to the Bank the said mortgage for $12,500. Under article III, section 1(i), the Debtor, if it did not deliver principal cash collected, was obliged to deliver to the Bank in lieu thereof "an amount of cash or securities provided for in paragraph (e) Section 1, Article I hereof." That section reads: "Cash, certificates of deposit issued by banks or trust companies, United States Treasury certificates of indebtedness, bonds of the United States of America or of the City or State of New York, all of which shall be valued at their market value as of the date of deposit."

Mortgage No. 8934 was not eligible for delivery in lieu of such principal collection. The Bank should not have received it as part of the assets of the Trust Fund. This item must be deemed the Bank's own investment and eliminated from schedule "A." The Bank will be charged with $12,-500, the amount by which the schedule is thereby rendered short.

I recommend that objection numbered third be sustained and the Bank surcharged with $12,500. Upon restoration to the Trust Fund of this sum, mortgage No. 8934 will be assigned to the Bank.

■ C. Between February 19, 1932, and December 9, 1932, the Debtor collected $4,758.36 principal from the underlying collateral. Instead of depositing such principal collections with the Bank it delivered to the Bank, and the Bank accepted for cancellation, $5,300 principal amount of Ninth Series Bonds, pursuant to article III, section 1(i). All but $900 principal amount of said bonds was of current maturities. Under article I, section 5, and article III, section 1(i), the Debtor had the right to collect and retain the principal payments on the collateral and to deliver to the Bank in lieu thereof an equal face principal amount of Prudence Bonds maturing within six months. As to the first item of $1,000 I think the transaction cannot be deemed unauthorized, even though it enabled the Debtor to keep cash it could not lawfully have withdrawn after deposit in the Trust Fund.

The other transactions complained of, aggregating $4,300, were distinctly unauthorized. The Debtor by that time had defaulted. Article IV, section 1(d), provided: "In the event of the inability of the corporation to pay at maturity, or within eighteen months thereafter the principal and interest of any Prudence Bonds issued

and outstanding hereunder, the corporation shall have the right during such period to pay in part, pro rata, the principal past due and unpaid upon all such Prudence Bonds, with the accrued interest on the amount so paid."

The claim that, despite the default of the Debtor, the general reservation of rights until the Guarantor's corresponding default eighteen months later (art. IV, sec. 1(d)) included the right to pay off bonds, is, in my opinion, untenable. Such reservation is limited to such rights, the exercise of which would rehabilitate the Trust Fund during the eighteen months in question, and to remedy its default and not to aggravate it. These rights included the right to make payment on the outstanding bonds pro rata but not the right to pay and discharge some bonds at the expense of the others. The right of pro rata payment was exclusive of all other rights with respect to payment. The Bank should not have accepted these bonds. This is particularly true of such of the bonds as were not of current maturities.

However, to get the cash which the Debtor collected the Bank would have had to make a demand and institute suit. As has already been demonstrated, the Trust Fund at the time was closed against any claims of the Debtor. There was therefore no opportunity for set-off available to the Bank; no way in which the Bank could have exacted payment except by demand and suit. Under article V of the indenture the Bank was not required to bring such suit without the indemnity therein prescribed. The Bank was thus clothed with full immunity. Hazzard v. Chase National Bank, 159 Misc. 57, 287 N.Y.S. 541, affirmed 257 App.Div. 950, 14 N.Y.S.2d 147, affirmed 282 N.Y. 652, 26 N.E.2d 801. Accordingly I recommend that this objection be dismissed.

D. These objections raise the question whether any of the acts and proceedings accounted for should ever have been transacted, because the Bank had failed to enforce the following covenant of the Debtor contained in the indenture (art. III, sec 1(f)): "That it will deposit with the Trustee a guarantee of The Prudence Company, Inc., guaranteeing payment of interest semi-annually when due, and of principal within eighteen months after the same becomes due, according to the terms of each bond, mortgage and other security in the Trust Fund under paragraphs (a), (b) and (c), Section 1, Article I hereof."

The guarantee was not deposited; it was not demanded by the Bank, nor was any proceeding taken by the Bank to enforce the covenant. Not having the guarantee, the Bank could not bring proceedings against the Guarantor, for the defaults of income and principal on the underlying mortgages.

The Objectors claim that the guarantee was a necessary element of the collateral; that it should have been obtained before any bonds were authenticated; that it should have been enforced in accordance with its terms; and that a proper claim should have been filed in the Guarantor's reorganization proceeding which, according to the Objectors, would have resulted in the distribution of dividends in that proceeding.

Article I, section 1, which sets forth the contents of the Trust Fund, does not specify the guarantee as a part of such contents. The Bank, therefore, cannot be held to account for having authenticated the bonds and initiated the acts and proceedings accounted for.

The question remains whether it should have tried to enforce the covenant. Of course, it should; but here again, since there was no prescribed demand and indemnity, the Bank is clothed with immunity.

The Objectors proved the dividends which had been paid in the Guarantor's reorganization proceeding. They claim that if the Bank had obtained such guarantees and filed a claim thereon in such reorganization proceeding, it would have received a like distribution. This does not follow. There was no bankruptcy distribution in that proceeding, but a plan of reorganization under former Section 77B of the Bankruptcy Act. In view of the tremendous increase in the aggregate claims which such guarantees, if obtained, would have entailed, it does not follow that the same plan would have been adopted by the consent of the creditors, or that it would have been found fair or feasible by the Court.

I recommend that objections fourth and fifth be dismissed.

### Motions to Dismiss

The Bank moves to dismiss the objections on the grounds that the Objectors' claims are barred by the Statute of

Limitations of the State of New York, and that the New Company and the Reorganization Trustees are not the proper parties in interest. The motions should be denied as to both grounds on the authority of the Manufacturers Trust Company v. Kelby et al., 2 Cir., 125 F.2d 650, which is still the law of this case.

### Findings of Fact and Conclusions of Law

I make, separately stated and numbered, the following findings of fact and conclusions of law:

### Findings of Fact

1. Prudence Bonds Corporation, the Debtor herein, was organized on or about December 9, 1919, under the Business Corporations Law of New York, and all of its outstanding shares were issued at the time of its organization for $50,000 cash to Realty Associates.

2. The Debtor's subscribed capital of $50,000 was immediately loaned to the Prudence Company, Inc.

3. The Prudence Company, Inc., the Guarantor herein, was incorporated as an investment company under article 7 of the Banking Law of New York on or about August 22, 1919, under the name of Realty Associates Investment Corporation, and on or about August 18, 1921, changed its name to the Prudence Company, Inc., by the authority of the Superintendent of Banks; all of its outstanding common stock and $5,000,000 par value of its preferred stock were owned by New York Investors, Inc., and an additional $5,000,000 par value of said preferred stock was owned by the public.

4. New York Investors, Inc., was organized on or about November 2, 1901, under the Business Corporations Law of New York, under the name of Realty Associates, and on or about January 19, 1929, changed its name to New York Investors, Inc.; it was the parent corporation of both the Debtor and the Guarantor.

5. During the period from on or about January 15, 1920, to on or about February 2, 1931, the Debtor became the obligor on eighteen series of self-styled first mortgage collateral bonds under eighteen separate trust agreements in the following manner:

Certain bonds and mortgages and other securities acquired by the Guarantor with its own corporate funds, together with various sums of cash were sold, assigned, transferred, conveyed and delivered by the Guarantor to the Debtor, which the Debtor in turn sold, assigned, transferred, conveyed and delivered to various Trust Companies, as trustees under written Trust Agreement made by the Debtor to the said Trust Companies; thereupon bonds of various denominations and staggered maturities were, from time to time, signed and sealed by the Debtor, endorsed with the guaranty of the Guarantor, authenticated by the respective trust companies as such trustees and delivered to the Debtor; the Debtor thereupon delivered the said First Mortgage-Collateral Bonds to the Guarantor in consideration for the bonds and mortgages and other securities and cash aforesaid which the Guarantor had sold, assigned, transferred, conveyed and delivered to the Debtor; the bonds which were thus created were then sold to the public by the Guarantor.

6. Among the Trust Agreements made by the Debtor to secure its eighteen series of first mortgage-collateral bonds was the Trust Agreement dated March 1, 1927, made to the President and Directors of the Manhattan Company (herein called the "Bank") securing the Debtor's First Mortgage-Collateral Bonds, Ninth Series; the Trust Agreement is herein referred to as the "Trust Agreement."

7. Physically attached to the Trust Agreement is a written guaranty between the Guarantor and the Bank, whereby the Guarantor unconditionally agreed with the Bank for each and every person, firm and corporation, who shall at any time thereafter hold or own any of said Prudence Bonds, Ninth Series, to guarantee the due and punctual payment by the Debtor of the interest on each and every one of the bonds as and when the same became due and payable, and the payment of the principal of the bonds within 18 months after the same by their terms became due and payable, or forthwith when due by declaration; the Guarantor further agreed to execute its covenant of guarantee upon each of the bonds in words and figures following:

"In consideration of the purchase of the within bond, The Prudence Company, Inc., hereby unconditionally guarantees to the holder thereof, the due and punctual payment by Prudence-Bonds Corporation of the interest thereon as the same becomes due and payable and also the payment of the principal thereof within eighteen months after the same by its terms becomes due and payable, or forthwith when due by dec-

laration, together with interest thereon after maturity at the same rate until payment of principal is offered.

"By the acceptance of the within bond, the holder thereof agrees to the terms and conditions of this guarantee and to all the provisions and conditions of the within mentioned Trust Agreement, including those limiting the exercise by the Trustee of rights and remedies thereunder upon default.

"The Prudence Company, Inc.,
By
_____"

8. In addition to the Trust Agreement securing the First Mortgage Collateral Bonds, Ninth Series, the Debtor executed 17 other trust agreements substantially similar in scheme which had annexed thereto an agreement of guaranty made by the Guarantor in substantially similar terms. The Bank was also trustee of the Debtor's First Mortgage-Collateral Bonds, Fifth Series, under Trust Agreement dated April 1, 1925.

9. Prior to January 2, 1932, the interest and principal on the bonds of all series were paid when due, but on or about January 2, 1932, the Guarantor announced the Debtor's proposed default and bonds of all series thereafter presented for payment at maturity were returned to the bondholders with a notice of which the Bank had knowledge, to the effect that currently maturing bonds would not be paid until payment was due under the guaranty, to wit, 18 months later.

10. After January 2, 1932, the Debtor became in default in the payment of principal due on all of its outstanding bonds as they severally matured, and it so remained in default.

11. The Debtor failed to pay the principal due on all Ninth Series Bonds maturing March 1, 1932, and thereafter; and the Guarantor failed to answer under its guaranty for the Debtor's default.

12. On June 29, 1934, the Debtor filed in this Court its voluntary petition for reorganization under Section 77B of the Bankruptcy Act and in said reorganization proceedings was subsequently found to be insolvent.

13. On February 1, 1935, the Guarantor filed in this Court its voluntary petition for reorganization under Section 77B of the Bankruptcy Act and in said reorganization proceedings was subsequently found to be insolvent.

14. On January 7, 1935, the parent company, New York Investors, Inc., filed in this Court its voluntary petition for reorganization under Section 77B of the Bankruptcy Act in said reorganization proceedings was subsequently found to be insolvent.

15. By order made and entered herein on June 29, 1934, the Debtor's petition for reorganization was approved as properly filed under Section 77B of the Bankruptcy Act, and Charles H. Kelby and Clifford S. Kelsey were duly appointed Temporary Trustees of the Debtor.

16. By order made and entered herein on July 31, 1934, the appointment of Charles H. Kelby and Clifford S. Kelsey, as trustees, was made permanent.

17. Charles H. Kelby and Clifford S. Kelsey duly qualified as trustees of the debtor and have ever since been and now are acting in that capacity.

18. The orders of June 29, 1934, and July 31, 1934, vested the trustees of the Debtor with the title to all of the property of the Debtor within the meaning of the Bankruptcy Act, with the powers of a trustee appointed pursuant to Section 44 of the Bankruptcy Act, the powers of a receiver in equity to the extent consistent with Section 77B, and also the power to institute, prosecute, become party to, intervene in, compromise or defend in any Court or before any tribunal suits or actions in law or equity or otherwise, which in their judgment might be necessary or appropriate for the recovery or protection of the properties or rights of the Debtor.

19. At the time the Debtor filed its petition for reorganization there were in the 18 series of bonds, approximately 83,000 bonds outstanding held by approximately 30,000 holders residing in the State of New York and elsewhere through the United States and in foreign countries; a large number of bonds were in bearer form, the names and addresses of the holders of the bearer bonds were mostly unknown, and a substantial number of the bonds were held by the savings bank type of investor with limited means and limited investment experience; upon the sale or transfer of a Prudence bond of any series a new bond was not issued or authenticated.

20. As of December 31, 1935, the Debtor was obligated on its 18 series of first mortgage-collateral bonds as follows:

| Series | Unpaid principal, with accrued interest |
| --- | --- |
| A | $ 552,565.22 |
| AA | 1,845,210.76 |
| Third | 4,069,983.88 |
| Fourth | 1,322,162.03 |
| Fifth | 2,763,911.27 |
| Sixth | 3,394,899.50 |
| Seventh | 5,241,706.50 |
| Eighth | 4,746,979.42 |
| Ninth | 2,998,737.02 |
| Tenth | 1,238,977.08 |
| Eleventh | 1,164,083.34 |
| Twelfth | 4,818,103.29 |
| Thirteenth | 5,428,427.47 |
| Fourteenth | 5,278,468.71 |
| Fifteenth | 5,298,340.94 |
| Sixteenth | 4,268,911.67 |
| Seventeenth | 4,923,187.50 |
| Eighteenth | 2,495,184.73 |
| | $61,849,840.33 |

21. In the course of the reorganization proceedings the Court by order made and entered herein on April 27, 1937, found that the Debtor was insolvent and that the fair value of the collateral securing each of the 18 series of bonds, was less than the principal amount of the outstanding bonds and accrued unpaid interest thereof, and that the Debtor, its stockholders and general creditors, had no equity in the collateral in any Series.

22. Separate plans of reorganization for each of the 18 series and a general plan of reorganization were duly proposed, and after amendment were duly found to be fair and feasible, and were duly accepted by the bondholders, and were duly confirmed in this proceeding.

23. A general plan of reorganization was likewise confirmed in this proceeding and provided for the formation of a new corporation under the Stock Corporation Law and Section 9-b of the General Corporation Law of New York, the issuance of its entire capital stock to voting trustees, and the issuance to bondholders of voting trust certificates and voting trust scrip, representing its entire capital stock.

24. The said General Plan provided for the assumption by said New Corporation of all the first mortgage-collateral bonds of the Debtor reorganized in the proceeding and as modified therein.

25. By the terms of said General Plan all the books and records of the Debtor and all of the assets and property of the Debtor pledged to secure any of the outstanding first mortgage-collateral bonds of the Debtor were transferred to and vested in said New Corporation.

26. The Plans of Reorganization as confirmed herein provided for an extension of the maturity of the bonds and a change in the interest provisions.

27. After the Plans of Reorganization were approved, the New Corporation was duly organized by the filing of its certificate of incorporation in the office of the secretary of State of the State of New York on or about February 8, 1938.

28. By order made and entered herein on April 5, 1938, the New Corporation was authorized and directed to take over and perform the servicing and management of the collateral underlying the 18 series of bonds, which order further provided in part as follows: "14. * * * That the above named Corporate Trustees and each of them upon compliance with the terms and provisions of this order shall be and they hereby are freed and discharged from the performance of any further duties under the respective Original Trust Agreements from and after the respective dates of such compliance with the terms and provisions of this order, except (a) to render their final accounts in this proceeding and (b) to assign, transfer and deliver pursuant to the further order of this Court the collateral underlying the said respective Series of Bonds to such trustee as may be designated to act under the Supplemental Trust Agreement provided for in the said separate Amended Plans of Reorganization for Prudence-Bonds Corporation and (c) to take such action in respect to said collateral as this Court may hereinafter from time to time, authorize and direct."

29. By order made and entered herein on April 13, 1938, the Voting Trust Agreement provided for by the General Plan of Reorganization was approved, and thereafter and pursuant to said order the Voting Trust Agreement was executed by and between the Reorganization Trustees, the voting trustees appointed by the Court and the New Corporation, and the entire capital stock of the New Corporation was deposited with the said voting trustees.

30. By order made and entered on April 27, 1938, to make effective, consummate and carry out the confirmed Plans of Reorganization, this Court approved a general form of modified or Supplemental Trust Agreement to be executed by the New Corporation to City Bank Farmers Trust Company, as trustee, in respect of each of the 18 series of bonds.

31. By said order of April 27, 1938, the Bank, as well as all the other trustees (except the Chemical Bank & Trust Company), were authorized and directed to forthwith and with all convenient speed, prepare and file an account of their respective acts and proceedings under the original Trust Agreement pertaining to the Fifth and Ninth Series of Bonds, and to make an appropriate application for the judicial settlement of said accounts.

32. By order made and entered herein on June 6, 1938, a form of Supplemental Trust Agreement in the Fifteenth Series Prudence Bonds was likewise approved, and Chemical Bank & Trust Company, as trustee of that series, was likewise directed to account.

33. No new bonds were issued or authenticated to make effective, consummate and carry out the Plans of Reorganization confirmed herein; the changes or modifications of the bonds were contained in an allonge executed by the New Corporation and attached to each bond.

34. During the months of August and September, 1938, the trustees under the original Trust Agreements securing the 18 series of bonds appeared generally herein and submitted themselves to the jurisdiction of the Court, and filed the accounts of their respective acts and proceedings as such trustees since the inception of their respective trusts, and respectively petitioned this Court for an order taking, determining, allowing and judicially settling their accounts and releasing and discharging them of and from any and all responsibility with respect to each and all of their acts and proceedings as such trustees under the Original Trust Agreements, and with respect to all matters contained in their accounts.

35. Upon the respective accounts and petitions the Court duly directed that all bondholders and parties in interest show cause why the relief prayed for should not be granted, and that objections, if any, to said accounts, separately stated and numbered, should be verified and filed with the Clerk of the Court on or before October 18, 1938.

36. On or about October 2, 1939, the New Corporation and the Reorganization Trustees, jointly and severally, on their own behalfs, and on behalf of the bondholders, filed herein detailed, separately stated and numbered, verified objections to the accounts of each of the trustees under the Original Trust Agreements, except to the account of the trustee of the Fifteenth Series, in which series the time to file objections has been extended and has not yet expired, and on or about the same date objections to the accounts of some of the said trustees were filed herein by individual bondholders.

37. The Bank duly filed its account on September 8, 1938; the Bank had not at any time or in any other Court or otherwise, accounted for its acts and proceedings as Trustee until it filed its account herein.

38. Thereafter and in due time objections to the Bank's account were filed herein by the New Corporation and the Reorganization Trustees, jointly and severally, on their own behalfs, and on behalf of the Fifth Series Bondholders, and by Sarah Helfant, Leopold Helfant (now deceased), Samuel Plasser and George E. Eddy, bondholders; at the trial the account and objections were duly amended.

39. The Court, the Reorganization Trustees, the New Corporation and the bondholders had no knowledge of the facts alleged in the objections to the Bank's account until after the Bank filed its account.

40. On June 26, 1928, Leopold Helfant and Sarah Helfant, as joint tenants, and their survivor, became the owners of eight $1000 Ninth Series Bonds; said Leopold Helfant died on or about July 4, 1938, and the said Sarah Helfant is still the owner thereof.

41. In or about the year 1929 Samuel Plasser became the owner of bond No. 9M-943 of the Ninth Series, which he still owns.

42. The objector, George E. Eddy, never was, and is not now, the owner of a first mortgage-collateral bond of the Ninth Series, but he is the owner of bonds of the Fifth and other series.

43. Each bond and mortgage sold, assigned, transferred, conveyed and delivered by the Debtor to the Bank was so sold, assigned, transferred, conveyed and delivered

pursuant to the provisions of the Trust Agreement of each respective series, and by physical delivery of the bond and mortgage, accompanied by a separate written instrument of assignment executed by the Debtor to the Bank as such trustee.

44. Each bond, note or other evidence of indebtedness, mortgage certificate and other security (except cash), sold, assigned, transferred, conveyed and delivered by the Debtor to the Bank, was so sold, assigned, transferred, conveyed and delivered pursuant to the provisions of the Trust Agreement by physical delivery of each said security, accompanied by written endorsement of the Debtor or by separate written instrument of assignment executed by the Debtor to the Bank, as such trustee.

45. Cash forming part of the Trust Fund was transferred and delivered by the Debtor to the Bank, pursuant to the provisions of the Trust Agreement, by physical delivery of the cash.

46. When a bond and mortgage or other security (except cash) was returned by the Bank to the Debtor, it was assigned, transferred, conveyed and delivered by the Bank to the Debtor by written instrument of assignment and by physical delivery of the security returned.

47. Under the provisions of the Trust Agreement each and every sum of cash, and each and every security deposited in the Trust Fund, was security for all the outstanding Ninth Series Bonds, and the Bank had actual possession of and legal title thereto.

48. Under the terms of the Trust Agreement Ninth Series Bonds were issued and authenticated in denominations of $100, $500 and $1000, so that various principal amounts thereof matured on the 1st day of each March and September, from March 1, 1928, to March 1, 1937, inclusive.

49. It was the intention of the parties that the Trust Fund was to consist of securities of the kind authorized for deposit under paragraphs (a), (b) or (c) of section 1 of article I of the Trust Agreement (hereinafter called "Mortgage Collateral"), computed at the unpaid principal amount, and cash or other securities of the kind authorized for deposit under paragraphs (d) or (e) of said section 1 or article I computed at their market value, sufficient in the aggregate to at least equal the aggregate principal amount of all Ninth Series Bonds outstanding.

50. It was the intention of the parties that the scheme of the Trust Agreement was to secure the Ninth Series Bonds by mortgage collateral which would become liquid within six months preceding, or three months after, the maturity date of any Ninth Series Bonds, which together with cash and securities of the kind authorized for deposit under paragraphs (d) or (e) of section 1 of article I would be sufficient in amount and timely as to payment to provide for the Ninth Series Bonds so maturing in accordance with their terms.

51. The Debtor had no resources with which to pay its obligations on its Ninth Series Bonds, except the income and the principal payments on the securities in the Trust Fund.

52. It was the intention of the parties that the Debtor's obligations on its Ninth Series Bonds were to be paid out of the income and principal payments on the securities in the Trust Fund.

53. It was the intention of the parties that the Debtor's obligations on its bonds would mature as to time and amount substantially contemporaneously with the time and amount of the principal payments on the securities in the Trust Fund.

54. It was the intention of the parties that the Bank should undertake to hold the Trust Fund in its possession, and as long as the aggregate principal amount of the Trust Fund was not less than the aggregate principal amount of the Ninth Series Bonds outstanding, and as long as no event of default existed upon which the Bank, as trustee, might take action, the Bank was to permit the Debtor or the Guarantor to service the bonds and mortgages and other securities constituting the Trust Fund, and to collect the principal and income thereon without expense to the Trust Fund, and to pay the same over to the Bank before the 10th day of the subsequent calendar month, or to pay over in lieu thereof eligible securities of equal aggregate principal amount or to deliver in lieu thereof an equal face principal amount of Ninth Series Bonds maturing within six months after the date of such payment, for cancellation.

55. It was the intention of the parties that the Debtor should have the right to substitute one eligible security for another, to withdraw bonds, mortgages, cash and other securities constituting the Trust

Fund, and to otherwise deal with the Trust Fund.

56. It was the intention of the parties that the Debtor's right to substitute one eligible security for another and to withdraw bonds, mortgages, cash and other securities constituting the Trust Fund, and to otherwise deal with the Trust Fund, was limited.

57. It was the intention of the parties that the Bank should enforce the limitations upon the Debtor's right to substitute one eligible security for another, to withdraw bonds, mortgages, cash and other securities constituting the Trust Fund, and to otherwise deal with the Trust Fund.

58. It was the intention of the parties that the Bank should refuse permission to the Debtor for the withdrawal from the Trust Fund of any securities, including cash, if the Debtor was in default in the payment of principal due on any outstanding Ninth Series Bonds.

59. It was the intention of the parties that the Bank should refuse to permit the Debtor to withdraw from the Trust Fund any securities, including cash, either as excess collateral, on substitution of other collateral, or against the cancellation of Ninth Series Bonds, unless after the withdrawal there remained in the Trust Fund mortgage collateral computed at its then unpaid principal amount, which together with cash and securities of the kind authorized for deposit in the Trust Fund under paragraphs (d) and (e) of section 1 of article I of the Trust Agreement, computed at their then market value, would in the aggregate at least equal the aggregate principal amount of all Ninth Series Bonds then outstanding.

60. It was the intention of the parties that the Bank would refuse permission to the Debtor to withdraw from the Trust Fund any securities, including cash, either as excess collateral, on substitution of other collateral, or against the cancellation of Ninth Series Bonds, unless after the withdrawal the Trust Fund was in a liquid condition, that is to say, it contained mortgage collateral maturing within six months preceding, or three months after, the maturity date of any outstanding Ninth Series Bonds, which together with cash of the kind authorized for deposit in the Trust Fund under paragraphs (d) or (e) of section 1 of article I of the Trust Agreement would be sufficient in amount and timely as to payment to provide for the payment of Ninth Series Bonds so maturing in accordance with their terms.

61. It was the intention of the parties that, if and so long as any mortgage collateral in the Trust Fund was in default in the payment of principal, the Bank would refuse to permit the Debtor to withdraw from the Trust Fund any securities, including cash, either as excess collateral, on substitution of other collateral or against the cancellation of Ninth Series Bonds except (a) the defaulted mortgage collateral upon the substituting therefor of other eligible collateral, and (b) any mortgage collateral in connection with its redemption or final payment at maturity upon the substitution therefor of the amount collected in payment or redemption of such matured or redeemed mortgage collateral.

62. It was the intention of the parties that the Bank at all times should prevent any unauthorized change, substitution or withdrawals of the bonds, mortgages, cash or other securities constituting the Trust Fund.

63. It was the intention of the parties that the Bank should have the right to consult with any counsel of its own choosing about any matter pertaining to the Trust Fund and to its rights, duties and obligations under the Trust Agreement, and that the Bank should exercise that right at the expense of the Debtor, and that until paid the Bank should have a lien therefor upon the Trust Fund prior to all Ninth Series Bonds.

64. It was the intention of the parties that a mortgage in default in payment of any of its prescribed principal payments was in default as to all thereof, and that such a mortgage was not a maturing mortgage as to any prescribed principal payment, within the meaning of article I, section 6 of the Trust Agreement.

65. It was the intention of the parties that a default in the payment of a monthly deposit prescribed by any mortgage constituting part of the mortgage collateral was not a default in the payment of principal upon such mortgage, within the meaning of article I, section 6 of the Trust Agreement, until twenty days after such deposit became due, according to the terms of such mortgage.

66. On July 6, 1928, mortgage No. 9-737 in the principal sum of $95,000, a part

880

of the Trust Fund, was returned to the Debtor.

67. On or about June 23, 1928, the Guarantor and the Realty Associates entered into an ownership agreement relating to mortgage No. 9-737, which ownership agreement declared that the interest of the Guarantor in said bond and mortgage was a senior share to the extent of the principal sum of $85,000, and that the interest of Realty Associates was a junior and subordinate share to the extent of $10,000.

68. On July 21, 1928, mortgage No. 9-737 was redeposited in the Trust Fund, subject to the provisions of said Ownership Agreement.

69. On September 9, 1932, mortgage No. 9-737 in the then principal sum of $72,916.70 was returned to the Debtor by the Bank in exchange for $72,916.70 cash.

70. On July 6, 1928, mortgage No. 9-658, in the principal sum of $144,300, was in default in the payment of $616.66, a deposit on account of principal from July 1, 1928 to July 27, 1928.

71. From April 28, 1926, to March 30, 1932, Raymond D. Jones was vice-president of the Bank and a director of the Guarantor.

72. Between March 5, 1928, and January 13, 1933, inclusive, $1,977,391.69 in cash was returned by the Bank to the Debtor at its request in writing, of which $1,853,608.41 was returned as excess collateral and $123,783.28 was returned in exchange for bonds delivered to the Bank by the Debtor for cancellation.

73. The items of cash so returned to the Debtor, and the dates upon which each thereof was returned, respectively, are as follows:

| Date | | Amount |
| --- | --- | --- |
| March | 5, 1928 | $ 4,008.33 |
| August | 11, 1928 | 16,883.35 |
| August | 29, 1928 | 64,116.66 |
| October | 9, 1928 | 13,850.00 |
| November | 21, 1928 | 3,150.02 |
| December | 13, 1928 | 1,250.00 |
| March | 16, 1929 | 200.00 |
| March | 23, 1929 | 10,583.30 |
| April | 11, 1929 | 32,116.70 |
| May | 13, 1929 | 2,750.00 |
| May | 23, 1929 | 600.00 |
| May | 24, 1929 | 250.00 |
| June | 17, 1929 | 1,250.00 |
| September | 24, 1929 | 14,575.00 |
| November | 27, 1929 | 2,200.00 |
| December | 19, 1929 | 3,150.00 |
| February | 19, 1930 | 20,875.00 |
| February | 24, 1930 | 3,200.00 |
| April | 18, 1930 | 32,950.00 |
| May | 21, 1930 | 1,250.00 |
| May | 22, 1930 | 600.00 |
| June | 6, 1930 | 1,000.00 |
| October | 30, 1930 | 35,108.33 |
| January | 27, 1931 | 12,750.01 |
| March | 12, 1931 | 1,000,000.00 |
| March | 14, 1931 | 247,300.00 |
| March | 24, 1931 | 176,425.00 |
| March | 27, 1931 | 91,500.00 |
| June | 6, 1931 | 26,550.00 |
| June | 17, 1931 | 8,250.00 |
| June | 27, 1931 | 4,000.00 |
| August | 17, 1931 | 9,000.00 |
| September | 25, 1931 | 3,150.00 |
| October | 16, 1931 | 37,900.00 |
| November | 17, 1931 | 2,550.00 |
| December | 22, 1931 | 2,083.33 |
| March | 23, 1932 | 10,000.00 |
| April | 9, 1932 | 2,200.00 |
| April | 18, 1932 | 1,999.98 |
| May | 4, 1932 | 1,350.00 |
| June | 6, 1932 | 2,200.00 |
| June | 25, 1932 | 166.68 |
| July | 25, 1932 | 3,000.00 |
| August | 31, 1932 | 1,000.00 |
| September | 27, 1932 | 28,100.00 |
| October | 27, 1932 | 5,800.00 |
| November | 18, 1932 | 1,825.00 |
| December | 10, 1932 | 30,900.00 |
| December | 16, 1932 | 375.00 |
| January | 13, 1933 | 1,100.00 |

74. The said items of cash were returned to the Debtor at its request in letter writings, which writings characterized the withdrawal as excess cash, or cash requested in exchange for bonds to be cancelled.

75. On March 5, 1928, and June 6, 1930, no mortgage collateral was in default.

76. From and after September 1, 1931, mortgages constituting part of the collateral were, and continue to be, in default in the payment of principal.

77. The cash returned to the Debtor after September 1, 1931, as aforesaid, aggregated $135,699.99, of which $47,575.01 was returned as excess collateral, and the balance of $88,124.98 was returned in exchange for bonds returned to the Bank for cancellation.

78. After March 1, 1932, $90,166.66 of said cash was returned to the Debtor.

79. Before September 1, 1931, mort- were in default in payment of principal
gages constituting part of the Trust Fund as follows:

| Date of Withdrawal | Description of Securities in default in payment of principal | Principal Amount |
|---|---|---|
| August 11, 1928 | B&M 9-658 | $143,683.34 |
| August 29, 1928 | 9-658 | $143,683.34 |
| October 9, 1928 | 9-658 | $142,450.02 |
| November 21, 1928 | 9-658 | $141,833.36 |
| | 9-801 | 50,000.00 |
| | | $191,833.36 |
| December 13, 1928 | 9-658 | $141,216.70 |
| | 9-801 | 50,000.00 |
| | | $191,216.70 |
| March 16, 1929 | 9-658 | $139,333.34 |
| March 23, 1929 | 9-658 | $139,333.34 |
| April 11, 1929 | 9-585 | $221,600.00 |
| | 9-658 | 138,700.01 |
| | 9-737 | 82,291.67 |
| | | $442,591.68 |
| May 13, 1929 | 9-658 | $138,066.68 |
| | 9-737 | 82,291.67 |
| | 9-801 | 49,750.00 |
| | | $270,108.35 |
| May 23, 1929 | 9-658 | $138,066.68 |
| | 9-737 | 82,291.67 |
| | 9-757 | 44,875.00 |
| | | $265,233.35 |
| May 24, 1929 | 9-658 | $138,066.68 |
| | 9-737 | 82,291.67 |
| | 9-757 | 44,875.00 |
| | | $265,233.35 |
| June 17, 1929 | 9-737 | $ 81,875.01 |
| September 24, 1929 | 9-757 | $ 44,750.00 |
| | 9-793 | 69,300.00 |
| | | $114,050.00 |
| November 27, 1929 | 9-757 | $ 44,625.00 |
| | 9-801 | 49,500.00 |
| | | $ 94,125.00 |
| December 19, 1929 | 9-737 | $ 80,625.01 |
| | 9-801 | 49,500.00 |
| | | $130,125.01 |
| February 19, 1930 | 9-757 | $ 44,500.00 |
| February 24, 1930 | 9-757 | $ 44,500.00 |

| April | 18, 1930 | 9-585 | $190,575.00 |
|---|---|---|---|
| May | 21, 1930 | 9-801 | $ 49,250.00 |
| May | 22, 1930 | 9-801 | $ 49,250.00 |
| October | 30, 1930 | 9-585 | $188,825.00 |
| January | 27, 1931 | 9-585 | $187,800.00 |
| March | 12, 1931 | 9-793 | $ 67,550.00 |
| | | 9-874 | 84,600.00 |
| | | | $152,150.00 |
| March | 14, 1931 | 9-793 | $ 67,550.00 |
| | | 9-874 | 84,600.00 |
| | | | $152,150.00 |
| March | 24, 1931 | 9-874 | $ 84,600.00 |
| March | 27, 1931 | 9-874 | $ 84,600.00 |
| June | 6, 1931 | 9-585 | $185,525.00 |
| June | 17, 1931 | 9-585 | $185,525.00 |
| June | 27, 1931 | 9-585 | $185,525.00 |
| August | 17, 1931 | 9-585 | $184,725.00 |

80. On the dates aforesaid the Bank knew that all of the aforesaid mortgage collateral was in default in the payment of principal.

81. On March 13, May 24, June 26, September 12, 21, 28 and October 30, 1928, October 25, 1929, March 28, June 20, September 24, November 28, December 22, 1930, and February 27 and April 20, 1931, there were no defaults in the payment of principal upon any of the mortgage collateral constituting the Trust Fund, and the Trust Fund was at par and in liquid condition in accordance with the intention of the parties.

82. In returning to the Debtor the cash aforesaid the Bank gave the requests of the Debtor due consideration and acted with deliberation.

83. The Bank and the Debtor made monthly comparisons of their respective records, and each month an account was stated between the Bank and the Debtor showing the collateral in the Trust Fund, the Ninth Series Bonds authenticated, the maturities of the bonds so authenticated, the maturities of the principal payments on the mortgage collateral matched against said bond maturities, the cash and miscellaneous collateral in the Trust Fund, and a balance was struck.

84. Before January 1, 1932, the Bank and the Debtor, in stating accounts and in striking a balance as aforesaid, the amount of past-due mortgage collateral was deducted; after January 1, 1932, past-due mortgage collateral was not deducted.

85. On March 1, 1932, the Debtor defaulted in the payment of the principal on Ninth Series Bonds maturing on that date.

86. On August 31, 1942, the sum of $1,970,370 was still due and owing to the public holders of modified Ninth Series Bonds. Interest at 5½ per cent per annum had been paid to December 10, 1937.

87. It was the intention of the parties that the Debtor should deposit with the Bank a guarantee of the Guarantor guaranteeing as to the underlying collateral payment of interest semiannually when due, and of principal within eighteen months after the same became due, according to the terms of each bond, mortgage and other security in the Trust Fund, under paragraphs (a), (b) and (c) of section 1, article I of the Trust Agreement, and the Debtor covenanted so to do.

88. The Debtor defaulted in the performance of this covenant.

89. The Bank made no demand and took no action to enforce the performance by the Debtor of its said covenant; no request was made by bondholders that the Bank take such action and no indemnity for such action was tendered to it.

90. The bondholders did not know, and were not informed by the Bank, that the

Debtor had defaulted in the performance of said covenant.

91. At divers times mortgage collateral was in default in the payment of principal for eighteen months or more, of which the Bank had knowledge.

92. On February 1, 1935, when the Guarantor filed its petition for reorganization under Section 77B of the Bankruptcy Act, mortgage collateral was in default in the payment of principal for eighteen months.

93. In the Guarantor's reorganization proceedings the successor corporation to the Guarantor was authorized and directed as of December 30, 1939, to pay an initial dividend of eight-tenths of one per cent on account of claims filed in said proceedings, pursuant to the Plan of Reorganization duly confirmed therein.

94. The amount of claims allowed in that proceeding as of May 26, 1939, was $133,769,323.18, including the claim of the Reconstruction Finance Corporation amounting to $11,347,775.50.

95. The amount of cash on hand as of the effective date of the initial distribution to the creditors of the Guarantor was $1,-477,743.29, of which $979,372.38 was distributed, leaving $498,370.91 undistributed.

96. In January, 1942, there was distributed a second dividend of one per cent to claimants of record on December 31, 1941, amounting to $71,333,250.48, which sum was arrived at by deducting from the aggregate amount of original claims the appraised value of the collateral in the Guarantor's proceeding.

97. The cash available for such second distribution was the sum of $874,405.80.

98. After paying the said second dividend there remained on hand in the Guarantor's reorganizations the sum of $161,-073.26.

99. In the Guarantor's reorganization proceedings claims on the guaranty of the Ninth Series Bonds were duly allowed to the total amount of bonds outstanding, with accrued interest to February 1, 1935, excluding bonds held by the Guarantor.

100. On October 31, 1932, the Bank received from the Debtor mortgage No. 8934 for $12,500, with which the Bank debits itself.

101. On October 31, 1932, the Debtor collected $12,500 principal on mortgage No. 9-773.

102. Instead of turning the said principal collection over to the Bank the Debtor or delivered to the Bank mortgage No. 8934 for $12,500.

103. Between February 19, 1932, and December 9, 1932, the Debtor collected $4,-758.36 from the mortgage collateral.

104. Instead of depositing such principal collection with the Bank, the Debtor delivered to the Bank, and the Bank accepted for cancellation, $5,300 principal amount of Ninth Series Bonds, all of which, except $900 principal amount thereof, was of current maturities.

105. Between June 5, 1924, and July 18, 1933, the Guarantor was from time to time indebted to the Bank in its individual capacity for money loaned.

106. On July 30, 1931, the Bank in such capacity loaned the Guarantor $2,000,000 which on November 30, 1931, was reduced by payment to $1,000,000 and the latter amount was collateralized by the deposit with the Bank of bonds and mortgages and certificates of deposit. On July 18, 1933, the balance of said loan, then amounting to $1,000,000, was liquidated by acceptance by the Bank of title to the securities then on deposit as collateral to said loan.

107. The Bank did not realize any profit nor make any gain whatsoever from the acts complained of in the objections, or any of them.

108. The Bank was guilty of no fraud in committing the acts complained of in the said objections, or any of them.

109. No part of the Trust Fund at any time in its possession is now in possession of the Bank.

110. No part of the collateral returned to the Debtor by the Bank was so returned with the intention on the part of the Bank of circumventing any of the provisions of the Trust Agreement.

111. It was the intention of the parties that the Bank should be under no obligation to take any action to enforce any of the provisions contained in any of the securities deposited in the Trust Fund, or toward the execution or enforcement of the trust which, in its opinion, should be likely to involve it in expense or liability, unless the Debtor, or one or more of the bondholders, should furnish as often as required by the Bank indemnity satisfactory to it.

### Conclusions of Law

1. The Bank is entitled to a decree settling its account filed herein on the 8th day of September, 1938, as amended at the trial, and to be discharged from all

matters embraced in the said account and the said schedules annexed thereto, as so amended, except:

(a) The Bank is not entitled to credit for the items in amended schedule "E" of its said account, aggregating $47,575.01, for cash returned to the Debtor as excess collateral on the dates and for the amounts following:

1931

| | |
|---|---|
| Sept. 25 | $ 3,150.00 |
| Oct. 16 | 37,900.00 |
| Nov. 17 | 2,550.00 |
| Dec. 22 | 2,083.33 |

1932

| | |
|---|---|
| May 4 | 1,350.00 |
| June 25 | 166.68 |
| Dec. 16 | 375.00 |
| | $47,575.01 |

(b) The Bank is not entitled to credit for the items in amended schedule "E" of its said account, aggregating $88,124.98, for cash returned to the Debtor in exchange for bonds delivered to it for cancellation on the dates and for the amounts following:

1932

| | |
|---|---|
| Mar. 23 | $10,000.00 |
| Apr. 9 | 2,200.00 |
| Apr. 18 | 1,999.98 |
| June 6 | 2,200.00 |
| July 25 | 3,000.00 |
| Aug. 31 | 1,000.00 |
| Sept. 27 | 28,100.00 |
| Oct. 27 | 5,800.00 |
| Nov. 18 | 1,825.00 |
| Dec. 10 | 30,900.00 |

1933

| | |
|---|---|
| Jan. 13 | 1,100.00 |
| | $88,124.98 |

(c) The Bank is not entitled to credit for the item of $12,500 in schedule "A" for bond and mortgage No. 9-8934 delivered by it to the New Company.

2. The Objectors are entitled to a decree surcharging the Bank with the aggregate of the amounts aforesaid, to wit, the sum of $148,199.99, and to have judgment therefor with taxable costs.

3. Upon paying the judgment aforesaid to the New Company to be held by it subject to the order of the Court, the Bank is entitled to a lien in the sum of $88,124.98, upon the Trust Fund in possession of City Bank Farmers Trust Company, as trustee under supplemental trust indenture between Prudence Bonds Corporation (New Corporation) and City Bank Farmers Trust Company, as Trustee, dated as of March 1, 1938, which lien will be subordinate to the lien of the public holders of the modified Ninth Series Bonds and in parity with the lien of the holders of the subordinated Ninth Series Bonds.

4. Upon paying the judgment aforesaid to the New Corporation, to be held by it subject to the order of the Court, the Bank is entitled to have conveyed and delivered to it bond and mortgage No. 9-8934 now in possession of the New Company.

5. The Bank's defense that the objections are barred by the Statute of Limitations of the State of New York should be dismissed.

6. The Bank's defense that the New Company and the Reorganization Trustees are not the proper parties in interest should be dismissed.

7. The Bank's motions to dismiss the fourth, fifth and sixth objections should be granted, and the said objections dismissed.

8. The Bank's motion to dismiss the objections of George E. Eddy should be granted, and the said objections dismissed.